**In re MAXIM INDUSTRIES, INC., Debtor.**

**Bankruptcy No. 81–2327–HL.**

United States Bankruptcy Court, D. Massachusetts.

Aug. 10, 1982.

Sumner Darman, Silverman & Kudisch, Boston, Mass., for debtor.

## MEMORANDUM ON DENIAL OF CONFIRMATION

HAROLD LAVIEN, Bankruptcy Judge.

Maxim Industries, Inc., (Maxim), a former manufacturer of fire fighting equipment, filed a petition for reorganization under Chapter 11 on December 29, 1981. At the time that Maxim filed, it was a shell corporation since its secured creditor had taken possession of all its assets in January, 1981, and sold all those assets by October, 1981, including the right to manufacture fire fighting equipment under the Maxim name. In short, when Maxim filed its Chapter 11, it had no business, no employees and no assets except a potential tax loss.

In March, 1982, the debtor filed a proposed funding agreement and a hearing was held on a request for its approval. The initial request for approval of the funding agreement was denied because of the objection of the creditors' committee and the absence of a disclosure statement to adequately explain the nature of the agreement. However, even at that time, the court warned that the transaction appeared to be a questionable tax avoidance scheme.

The debtor subsequently filed a plan and disclosure statement. The plan and funding agreement proposed the following transaction. The debtor will acquire all of the stock of Somersworth, Inc., for $1,000,-000. Somersworth, Inc., is a corporation which was formed in May, 1981 to acquire all of the assets of four shoe manufacturing companies. These companies now all operate as divisions of Somersworth, Inc. (Somersworth). Funds would be provided to the debtor by Somersworth to fund the plan. The debt for the purchase of the stock incurred by the debtor would be subordinated to the payments required under the plan and would be represented by a note of the debtor. The plan provides that for four to five years (depending on the amounts), 25% of the pre-tax profits of Somersworth would be used to fund the plan unsecured creditors' payments under the plan.

The plan provides for the payment of $86,000 in wage claims, $108,000 in unfunded pension claims and $725,000 in tax claims, all items that the officers may have some individual secondary liability. There presently exists about $1,600,000 in unsecured claims. Since the payments under the plan are dependent on the pre-tax profits of Somersworth, the payments to the unsecured can only be estimated. Debtor's counsel estimates that the unsecured creditors will receive a dividend of at least 6½%, which may increase to 10% after objections to certain claims are made.

A disclosure statement and plan were sent out and the creditors voted in favor of the plan. It was evident from the begin-

ning that the minimal payment which this plan provided to the unsecured creditors would be more than they would receive in liquidation since the debtor was a mere shell. As a consequence of the unusual structure of the plan transaction, the Court insisted that the Internal Revenue Service be served with a copy of the plan and disclosure statement. The Court also required that an officer of Somersworth testify as to whether there was any business purpose behind this plan other than pure tax avoidance.

At the hearing on confirmation, Charles E. Bradley, the President and Treasurer of the debtor and the Treasurer of Somersworth, testified as to the purpose of this plan. Somersworth was acquired on May 28, 1981, through a leveraged buy-out. A leveraged buy-out is a purchase of all the stock or assets of a company with a small portion of the purchase price paid in as equity capital and the remainder of the price financed by debt capital of the very corporation whose stock is being purchased. In essence, the company's own assets substantially provide the financing to purchase the company. *See*, Lederman, *Leveraged Buy-Outs*, 11 Inst. Securities Reg. 405 (1979). In the instant case, Somersworth was purchased by having an investor group put up $10,000 for the common stock and an undisclosed amount of debt which was assumed by the corporation. Mr. Bradley's wife became a 25% shareholder of Somersworth. The wife of Mr. Agnew, another officer of the debtor, also became a shareholder of Somersworth.

The witness could not present one actual or even speculative business purpose why Somersworth, a successful shoe manufacturer with projected pre-tax earnings of over $1,000,000 would allow itself to be sold to this shell debtor with the shell being loaned the necessary cash by the corpora-

tion it is purchasing and the shell debtor corporation paying for the stock with a $1,000,000 note. The only purposes presented were tax motivations. (I could suggest one purpose which is the transformation of a $10,000 investment into a $1,000,000 bonanza.) The debtor itself had no business to reorganize nor any employees to retain.[1] The witness testified as to the following reasons why Somersworth was willing to go through this sham sale:

1. The principals' wives would have an estate value set for their stock.

2. Bradley and Agnew, as the debtor's former officers, would avoid $86,000 in wage claims, $108,000 in unfunded pension claims and $750,000 in tax claims that they might be personally liable for and which would now be paid by Somersworth.

3. If Somersworth could use the debtor's tax loss carry-forward, the post-tax earnings and thus cash flow would be substantially increased. However, this benefit was only a bonus, the real unmentioned gain would be number 4.

4. The stock in Somersworth purchased for $10,000 and now, according to Bradley, worth $300,000,[2] will be exchanged for the debtor's $1,000,000 note. Even using Bradley's 20% discount figure, the shareholders would realize about $750,000 for the original $10,000 investment and get long term installment benefits.

The debtor's unsecured creditors would receive a mere 6½ to 10% dividend over five years which is contingent upon Somersworth's profit performance. If one evaluated present value of these payments over five years using a 20% discount rate[3] the result would be a mere 3–6% dividend in real terms.

Who benefits from this game of mirrors? Certainly neither the debtor nor the credi-

---

1. The disclosure statement indicates that the Industries may try to recover some licenses on patents, but the disclosure statement emphasizes that this is highly unlikely. There was further a reference to possibly reactivating Maxim to deal with fire related safety equipment.

2. The $300,000 is probably a low figure based on the projected earnings of over $1,000,000 a year. But according to Bradley, even for $300,000 a buyer would be hard to find.

3. Mr. Bradley used 20% to discount the Maxim purchase note.

tors. To allow this plan would be to subvert Congressional intent in a manner that even the best of the perfumer's art could not disguise.

This plan does not comply with 11 U.S.C. § 1129(a)(3) in that it was not proposed in good faith. The purpose of a Chapter 11 reorganization proceeding is to enable a business to rehabilitate itself and become a profitable going concern. *In re International Horizons, Inc.,* 15 B.R. 798, 800 (Bkrtcy.N.D.Ga.1981); *Citicorp Business Credit, Inc. v. Blazon Flexible Flyer,* 407 F.Supp. 861 (N.D.Ohio 1976). Chapter 11 was not designed to permit the use of shell corporations for the personal benefit of the officers of the corporation. In fact, under the new Bankruptcy Code, a corporation or partnership is not entitled to a discharge in Chapter 7. 11 U.S.C. § 727. This change in policy from the old law was specifically aimed at avoiding trafficking in corporate shells and bankrupt partnerships. House Report No. 95–595, 95th Cong., 1st Sess. 384–385 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 98–99 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

Bankruptcy is perceived as a haven for wistfulness and the optimist's valhalla where the atmosphere is conducive to fantasy and miraculous dreams of the phoenix rising from the ruins. Unfortunately, this Court is not held during the full moon, and while the rays of sunshine sometimes bring the warming rays of the sun, they more often also bring the bright light that makes transparent and evaporates the elaborate financial fantasies constructed of nothing more than the gossamer wings and of sophisticated tax legerdemain.

I find that this plan which has a shell debtor purchasing a solvent corporation is such a gossamer wing and has not been proposed in good faith. Confirmation is denied pursuant to 11 U.S.C. § 1129(a)(1) and (3). Debtor's Motion for Reconsideration (which was labeled noncontroversial on the ground that no one objected) is denied.

Even though no party in interest objects to confirmation, the Court has an independent duty to deny confirmation when the requirements of § 1129 do not exist. *In re Economy Cast Stone Co.,* 16 B.R. 647, 8 B.C.D. 807 (Bkrtcy.E.D.Va.1981).