In re SHERWOOD SQUARE
ASSOCIATES, Debtor.

Bankruptcy No. 85–A–2037.

United States Bankruptcy Court,
D. Maryland,
at Rockville.

Jan. 12, 1989.

Marcia K. Docter, Charles A. Docter, Loren L. Chumley, Docter, Docter & Salus, P.C., Washington, D.C., for debtor.

Deborah Hunt Devan, Steven M. Caplan, Nicole E. Porter, Weinberg & Green, Baltimore, Md., for Fairfax Sav., objecting secured creditor.

Lawrence D. Coppel, James A. Vidmar, Jr., Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., for City of Westminster.

David F. Albright, Sr., Semmes, Bowen & Semmes, Baltimore, Md., for interested parties Louis Seidel, et al.

## MEMORANDUM DECISION AS TO CONFIRMATION OF FIFTH AMENDED PLAN

E. STEPHEN DERBY, Bankruptcy Judge.

This matter is before the Court for confirmation of Debtor's Fifth Amended Plan of Reorganization (as Finally Amended) (herein the "Plan"). Objections to confirmation have been filed by Fairfax Savings, a Federal Savings Bank ("Fairfax"), the primary secured creditor of Debtor, and by certain insider unsecured interests, including the former general partners of Debtor and referred to herein as the Ellerin parties. The objections were heard at a confirmation hearing conducted over several days. Debtor and the objecting parties have submitted briefs and, pursuant to the procedure established by the Court, have designated for consideration certain portions of the record from the earlier confirmation hearing on Debtor's Fourth Amended Plan.

The objections to confirmation filed by Fairfax are extensive. Fairfax contends Debtor has failed to carry its burden of proof to overcome the objections, which include the following:

I. Failure of the Plan and the Plan's proponent to comply with the applicable provisions of Title 11, as required by 11 U.S.C. § 1129(a)(1) and (2);

II. The Plan is not proposed in good faith and is therefore in violation of 11 U.S.C. § 1129(a)(3);

III. The Plan proposes certain payments to insiders with no authorization by the Court in violation of 11 U.S.C. § 1129(a)(4);

IV. No evidence exists that the post confirmation management of Debtor by Messrs. Roger and Michael Dowd is in the best interests of creditors as required by 11 U.S.C. § 1129(a)(5);

V. The Plan is not feasible as required by 11 U.S.C. § 1129(a)(11);

VI. The Plan unfairly discriminates against Class 3B in violation of 11 U.S.C. § 1129(b). The Plan is not fair and equitable to dissenting Classes 3A and 3B, which violates 11 U.S.C. § 1129(b)(2)(A);

VII. The cramdown interest rate proposed by the Plan is less than an appropriate market rate for the instrument offered Fairfax, contrary to the requirements of 11 U.S.C. § 1129(b)(2)(A); and

VIII. The Plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B) for unsecured claims.

The Ellerin parties contend that the Plan violates the absolute priority rule as to their unsecured Class 5 claims because they are not paid in full ahead of interests which are junior in priority. In support of confirmation of the Plan, Debtor urges that all the requisites of 11 U.S.C. § 1129 have been met. For the reasons stated below, the Court holds that Debtor has failed to meet its burden of proving the requirements for confirmation on certain issues. Therefore, the Court is not able to confirm the Plan as presently constituted. However, it appears to the Court that Debtor could cure the defects identified herein, if it chooses to do so, by modification pursuant to 11 U.S.C. § 1127(a) and (d). The Court will discuss the objections *seriatim*.

## I.

### COMPLIANCE WITH APPLICABLE PROVISIONS OF TITLE 11

a. *Payments to Insiders for Unauthorized Debt*

Historic Westminster Associates Limited Partnership (the "Investment Partnership") is conditionally to receive under the Plan deferred payments with six percent interest on a principal amount which, as of August 10, 1988, was $1,677,710.91 (Plan, Art. VII). This amount consists of money advanced to or for Debtor over the course of the bankruptcy case by the Investment

Partnership for adequate protection payments to Fairfax and for expenses of Debtor, including professional fees, with no authorization by the Court pursuant ·to 11 U.S.C. §§ 364(b), 330 or 331. Fairfax contends that unauthorized postpetition loans to a debtor-in-possession may not be repaid pursuant to a plan of reorganization. Fairfax contends further that to the extent these advances include professional fees paid to Debtor's counsel, they cannot be allowed because Debtor's counsel is not disinterested as required by 11 U.S.C. §§ 327 and 328.

■ The condition precedent to payment of this claim, however, is that "... the Bankruptcy Court .... determine pursuant to Sections 330, 331 and 1129(a)(4) of the Bankruptcy Code that the expenditures involved in the advances constituted administrative expenses of the Debtor and were reasonable". Plan at 14. The debtor-in-possession may incur postpetition unsecured debt outside the ordinary course of business, but it must seek the Bankruptcy Court's authority pursuant to 11 U.S.C. § 364(b). Notice and an opportunity for a hearing is required. 11 U.S.C. §§ 364(b), 102(1). Collier's suggests that "[w]here the borrowing is out of the ordinary course of business and prior court authorization is not obtained, the lender may be relegated to the status of a general unsecured creditor". 2 *Collier on Bankruptcy* para. 364.-03 (15th ed.1988).

Nevertheless, the issue of whether the post-petition advances by the Investment Partnership to Debtor should be approved is not presently before the Court. In order for these payments to be made, pursuant to the Plan's terms, Debtor must seek approval, *nunc pro tunc,* and a hearing must be held to determine whether equitable reasons exist to grant the application. *See, e.g., Matter of Alafia Land Development Corp.,* 40 B.R. 1, 4 (Bkrtcy.M.D.Fla.1984) (discussing and applying an equitable test for determination of *nunc pro tunc* approval of an unauthorized loan as set out by the Second Circuit in *In re American Cooler Company, Inc.,* 125 F.2d 496 (2 Cir.1942)). Since the Plan makes payments to the Investment Partnership dependent upon a finding by the Court that the expenditures for which the money was advanced constitute authorized administrative expenses and were reasonable, the Court is inclined to overrule Fairfax's objection. However, the scope of the Court's review for approval must be expanded and not restricted just to expenditures under 11 U.S.C. §§ 1129(a)(4), 330 and 331. It must encompass all provisions of the Bankruptcy Code which may be applicable to either the post-petition advances or to the expenditures.

b. *Rejection of a Non-executory Contract*

The Modifications Memorandum, which will modify the loan documentation for Fairfax's secured claim under Class 3A of the Plan (Art. V), contains a provision which states that releases granted Fairfax and other related persons and entities are deleted. Modifications Memorandum, Para. 5. Fairfax argues that Debtor cannot reject this provision because the modified deeds of trust and loan documents are not executory contracts. 11 U.S.C. § 365.

The Court does not view this modification as a rejection of an executory contract. Whatever claims may be asserted under the present indemnification provision already exist under the definition of claim in 11 U.S.C. § 101(4), although they may not be liquidated. These claims are not being rejected. Rather, what the Plan provides for Fairfax is that, as to future events under the new package Debtor is proposing as fair and equitable for satisfying Fairfax's secured claim (11 U.S.C. § 1129(b)(2)(A)), these indemnification and similar provisions will no longer be a part. Therefore, the objection is overruled.

## II.

## BAD FAITH

Debtor must propose its plan "in good faith and not by any means forbidden by law". 11 U.S.C. § 1129(a)(3). Since the Bankruptcy Code does not define the concept of good faith, "... the bankruptcy

court must inquire into the debtor's conduct as a whole in determining whether the plan was filed in good faith." *In re Smithfield Estates, Inc.,* 52 B.R. 220, 223 (Bkrtcy.D.R.I.1985). In *Matter of Madison Hotel Associates,* 749 F.2d 410, 425 (7 Cir. 1984), the Seventh Circuit stated:

... for purposes of determining good faith under section 1129(a)(3) ..., the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code....

\* \* \* \* \* \*

The plan "must be 'viewed in light of the totality of the circumstances surrounding confection' of the plan [and] ... [t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals." *In re Jasik,* 727 F.2d 1379, 1383 (5th Cir.1985) (quoting *Public Finance Corp. v. Freeman,* 712 F.2d 219, 221 (5th Cir.1983)).

Fairfax argues that the Plan is not proposed in good faith because it is an attempt by insiders, including the Investment Partnership and its affiliates, Sherwood Square Management Corporation and ISI, to cause Debtor to repay insider claims, barred claims, disputed claims and claims for loans that should be equity contributions, in preference to claims of unrelated secured and general unsecured creditors. Fairfax points to the fact that general unsecured creditors will receive only $50,000 under the Plan at confirmation, an amount constituting 66.6 percent of their claims, without interest, while insiders may receive 100 percent of their claims, their unauthorized post-petition advances, plus interest, fees and an undetermined incentive management fee.

Fairfax also complains that the Plan proposes a 15–year term for its secured debt, on a 25 year amortization schedule with a balloon in year fifteen, and that this stretching of the pay-back period of its secured debt allows Debtor to pay off insiders, from projected cash flow, within 13 years. Fairfax argues further that an admitted primary purpose of the Plan is to save the approximately one million dollars in taxes for the limited partners. Fairfax cites *In re Maxim Industries, Inc.,* 22 B.R. 611, 613 (Bkrtcy.D.Mass.1982) for the proposition that plans motivated by tax benefit purposes are not proposed in good faith as a matter of law, and thus are not confirmable. Fairfax cites a $180,000 offer to purchase the Dryer Building and Debtor's failure to accept the offer as evidence of bad faith since the proceeds would go directly to Fairfax. Finally, Fairfax argues that the classification of claims by Debtor was for the purpose of manipulating the voting.

■ Taking these contentions in reverse order, in its Additional Findings and Conclusions Concerning Objections to Fourth Amended Plan herein, the Court has previously ruled on objections to the classification of claims, and the revisions in this Plan have addressed the Court's concerns. Nothing new has been presented to persuade the Court that the present classification of claims was in bad faith to manipulate voting. The failure of the Debtor immediately to accept an $180,000 offer for the dryer building does not suggest the Plan was proposed in bad faith. It was reasonably debatable whether acceptance of the offer was in the best interests of the Debtor partnership and its efforts to reorganize for the greater benefit than just Fairfax. Delay in paying Fairfax does not suggest bad faith, so long as the protection of its secured claim is not destroyed.

The Court is not persuaded by Fairfax's argument that because a primary purpose of Debtor's Plan is tax savings by the limited partners, the Plan is proposed in bad faith. The *Maxim Industries* case cited by Fairfax is inapposite here. In *Maxim Industries,* "... when [the debtor] filed its Chapter 11, it had no business, no employees and no assets except a potential tax loss". *Maxim Industries,* 22 B.R. at 611. That debtor's plan was proposed solely to take advantage of the only asset of the estate—a tax loss. A comparable situation does not exist in the instant case.

The Court is also not persuaded by the arguments of Fairfax that the proposed structure for repayment of Fairfax's se-

cured debt justifies a finding of bad faith. The Bankruptcy Code allows for such terms over objection if they are fair and equitable. Further, Fairfax's interest rate expert, Dr. Edmister, attributed less than one fifth of one percent to his assessment of the risk factor in determining the appropriate market rate of interest because of the balloon payment feature proposed under the Plan. The Court finds that a change in the structure of the obligation due Fairfax allowed by the Bankruptcy Code, which has virtually no impact on the associated risk of the security, is not an indicator of bad faith.

The Court is concerned about the Debtor's unfettered ability under the Plan to distribute excess cash flow to whomever it pleases over the course of the Plan, including the Investment Partnership and other affiliated insider entities, particularly if it may be to the detriment of Fairfax and its receipt of deferred payments. An attempt by a debtor-in-possession to give favorable treatment to an insider may violate the good faith requirement for a Plan. *In re Smithfield Estates, Inc.*, 52 B.R. 220, 223 (Bkrtcy.D.R.I.1985); *see also In re Future Energy Corp.*, 83 B.R. 470, 487 (Bkrtcy.S. D.Ohio 1988) (dicta). The good faith objection raised in the *Future Energy* case was "... premised purely upon the objectors' speculation as to the debtor-in-possession's *future* conduct, *i.e.*, the presumption that [debtor] will not pursue avoidance actions or object to insider claims." *Id.* The court rejected the assertion of lack of good faith as not being supported by the evidence, but noted that rejection of the good faith objection did not leave creditors without any remedy to cure future inequitable conduct by debtor-in-possession. Creditors could object to claims of insiders and seek appointment of a Chapter 11 trustee.

In this case testimony by Michael Dowd confirmed that nothing would prevent Debtor from writing checks for upstream payments to the Investment Partnership with excess cash flow generated by the property—projected to be $1,632,673, less the cost of tenant improvements by 1998 by Debtor's projections. The ability of Debtor to pay, and the likelihood it will pay, future excess cash flow to insiders is suspect as potentially violative of the good faith requirement for confirmation in 11 U.S.C. § 1129(a)(3). However, the justifications for future payments to insiders from excess cash flow in this case are numerous and discrete, *e.g.*, subordinated pre-petition claims for fees or loans, post-petition administrative expenses for loans or fees, fees for future services to be rendered, and return on equity interests. Some payments may have justification and others may not. For example, the Court must approve administrative claims for post-petition loans and expenses as valid. Therefore, the Court concludes, looking at the Plan and the potential for payments to insiders as a whole, that this potential does not itself establish a lack of good faith. Rather, the inquiry is more appropriately directed to particular categories of proposed payments to insiders and whether each category is justified under other specific requirements of the Bankruptcy Code. For example, as discussed previously, has there been compliance with the requirements of 11 U.S.C. §§ 1129(a)(4), 330, 331 and 364(b) for post-petition loans and expenditures proposed for repayment (Part I(b)), and has there been compliance with the absolute priority rule, discussed *infra*, Part VIII. Therefore, the objections based on bad faith under 11 U.S.C. § 1129(a)(3) are overruled.

## III.

## PAYMENTS TO INSIDERS

■ Fairfax contends, that, under the Plan, Debtor proposes to pay post-petition management fees of $207,770.00 to ISI for the years 1986–1988 (Plan at 14 and at Exh. 2, Sched. C) which have not been approved by the Court, in violation of 11 U.S.C. § 1129(a)(4). In addition, the Plan proposes to pay a bonus incentive management fee that has not been approved by the Court to an affiliate of Debtor, Sherwood Square Management Corporation. Plan at Exh. 2, Sched. C. Exhibit 2 to the Plan is Debtor's Seventh Amended and Restated Agreement and Certificate of Limited Partnership, dated as of July 20, 1988 ("Sev-

enth Partnership Agreement"). Schedule C thereto states, in part:

Sherwood Square Management Corporation shall receive an Incentive Management Fee equal to 30% of the amount by which cash flow (computed without deducting the Incentive Management Fee) exceeds the amount necessary to provide the Special Limited Partner and Class A Limited Partner with distributions equal to their Priority Return Account, which may be reallocated in whole or in part to leasing agents, management agents and other independent third parties in consideration of services rendered to the Partnership.

The Plan does not contain a provision which requires Court approval of either category of fees prior to payment. To the extent these fees are attributable to pre-Effective Date services, Court approval is required before any payment of the fees is made under the Plan. Therefore, the Plan may not be confirmed because it presently fails to comply with 11 U.S.C. § 1129(a)(4).

## IV.

### POST CONFIRMATION MANAGEMENT

 Michael and Roger Dowd will be responsible for Debtor's management after confirmation. Disclosure Statement at 29–31. Fairfax contends that Debtor did not present evidence that management of Debtor by the Messrs. Dowd and their related or affiliated entities is in the best interests of Fairfax, which will be the only creditor remaining after confirmation. As such, Fairfax argues the Plan as proposed violates 11 U.S.C. § 1129(a)(5)(A). " ... [C]ontinued service by prior management [of Debtor] may be inconsistent with the interests of creditors, equity security holders, and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor...." *In re Polytherm Industries, Inc.*, 33 B.R. 823 (W.D.Wisc.1983) (citing 5 *Collier on Bankruptcy* para. 1129.02 (15th ed.1983) and remanding the case to the bankruptcy court for evaluation of the validity of appellants' allegations that the ser-

vices of the proposed officers would be contrary to the interests of creditors and public policy). Under the management of the Dowds, Debtor has replaced a major tenant and experienced an overall increase of its rent roll, additional space has been leased, improvements to the property have been made; and the Court's opinion of the value of the property as collateral for Fairfax's loan has increased by over $2,000,000 to $5,000,000 from the $2,650,000 value set early in the case as a basis for adequate protection payments. The Debtor should have first choice of its management, unless compelling cause to the contrary exists, and the Court concludes that continued management by the Dowds " ... is consistent with the interests of creditors and equity security holders and with public policy". 11 U.S.C. § 1129(a)(5)(A)(ii).

## V.

### FEASIBILITY

Fairfax contends that the Fifth Amended Plan of Reorganization is not feasible and therefore violates 11 U.S.C. § 1129(a)(11). In support of its contention, Fairfax raises the following objections:

- The stretchout of payments proposed under the Plan necessitates a stricter burden of showing feasibility, citing *In re Agawam Creative Marketing Assoc., Inc.*, 63 B.R. 612 (Bkrtcy.D.Mass. 1986) and *In re RKO Associates*, 4 B.C.D. 462 (Bkrtcy.S.D.N.Y.1978), a burden which Debtor has failed to meet.
- Debtor's updated income and expense projections are overly optimistic and are inconsistent with historical lease up and financial performance. For example,
 - Debtor has had to borrow $1.7 million over the past three years to meet its operating expenses, tenant lease up costs and adequate protection payments;
 - Occupancy was 40 percent at the inception of this bankruptcy case three years ago and is only 43 percent now;

- Debtor expects to complete lease up of the project by the end of 1989 while it required two and one half years to lease up 30 percent of the project; and
- Debtor has failed to rehabilitate and lease either the Dryer or Boiler buildings but has included income from both these buildings in the first half of 1989. Further, Debtor has failed to submit evidence of any commitment by a lender to loan funds sufficient to rehabilitate these buildings.
- Debtor's affiliate, Sherwood Square Management Corporation, which will continue to manage Debtor after confirmation, has not demonstrated that it is qualified.
- Debtor may be unable to fund a plan in the event of an adverse decision as to the easement claim of Westminster and the claim of David Fairbank, the total of which is $1,125,000.

■ Debtor contends that several factors indicate the Plan is feasible: 1) Debtor came within ten percent of attaining its revenue projection for the first eight months of 1988; 2) in that same time period Debtor leased 28,882 square feet and expects to lease another 9,200 square feet by year end 1988; and 3) Debtor expects to lease 27,000 square feet in 1989, less than what has already been leased in 1988 and almost 30 percent less than the total additional leased space expected for 1988. Debtor contends that the projected lease up by the first few months of 1990, based on the success of 1988, is attainable. Debtor urges that projections need not be precise, and that there need only be a reasonable likelihood of success of the plan.

The Court has been faced with a fundamental contradiction in the points which Fairfax has presented in support of its objections. Fairfax has not challenged as too low the $5,000,000 value of Debtor's property, and thus of Fairfax's secured claim. However, this value is based on income and expense projections for Sherwood Square, Debtor's project, which show that the project is feasible, albeit based on the income projections of Mr. Payne, Debtor's expert appraiser, which are slightly less optimistic than those presented by the Messrs. Dowd, Debtor's managers.

As will be addressed subsequently, Fairfax has also challenged the interest rate proposed by Debtor to be paid on account of Fairfax's secured claim under the Plan as too low because of the risks in the project. If the interest rate should be higher because of the risk, then the capitalization rate on Debtor's potential income for purposes of valuing the property by the capitalization of income method, which the Court agrees is most appropriate for the primary appraisal method for determining the market value of the project (excluding perhaps the dryer building), should be higher. If the capitalization rate is higher, the resulting market value of the property would be lower, the secured claim of Fairfax would be lower, the amount required to service repayment of Fairfax's secured claim would be lower, and the income projections for the project required to establish feasibility would be lower.

As support for the Plan which is internally consistent, the Court accepts Debtor's projections, discounted somewhat for being over optimistic as to the length of the lease-up period, as sufficient to establish feasibility of the Plan. Based on all the evidence submitted at the confirmation hearing, and the arguments in the briefs of the parties, the Court is of the opinion that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, ...". 11 U.S.C. § 1129(a)(11).

## VI.

### UNFAIR DISCRIMINATION

a. *Class 3B (unsecured)*

■ Fairfax asserts that it is unfairly treated as to its Class 3B unsecured claim in violation of 11 U.S.C. § 1129(b)(1), because the Plan does not give Fairfax a value equal to the value given to similarly situated unsecured classes. While general unsecured creditors are paid 66.6 percent

of their claims in cash at confirmation, 66.6 percent of Fairfax's unsecured claim is to be paid over a 15–year term, with interest, and Fairfax's yearly payments are calculated using a 25–year amortization, with a balloon payment at the end of year–15. Fairfax argues that this treatment, in effect, subordinates the Class 3B claim to the general unsecureds. Even though interest is proposed to be paid at the rate of 14½ percent per year, Fairfax argues that it may never receive the proposed payment on account of its unsecured debt because the Plan is risky. Debtor submits that this treatment is fair and equitable, and that the testimony of its interest rate expert, Dr. Puglisi, that 14½ percent interest will give Fairfax an amount equal to 66.6 percent of the amount of its allowed claim, is uncontradicted.

Fairfax continues to assert that Debtor's separate classification of its unsecured claim is improper, taking issue with the Court's previous finding to the contrary. *See* Additional Findings and Conclusions Concerning Objections to Fourth Amended Plan, filed herein on June 9, 1988, where the Court applied principles enunciated in *In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6 Cir.1986) and allowed Debtor to classify Fairfax's unsecured deficiency claims separately. Fairfax argues that the Court has failed to distinguish between a difference in classification based on the nature of the claim and an improper classification based on the nature of the claim holder. The Court disagrees. Fairfax has failed to distinguish correctly between the justification for separate classifications of claims, *e.g.*, for purposes of voting, on which the Court has previously ruled, and the issues of unfair discrimination and fair and equitable treatment as among classes.

As to alleged unfair discrimination and lack of fair and equitable treatment because Class 3B unsecured debt is paid out over time, the Plan proposes to pay a high 14½ percent annual interest to Fairfax to compensate it for its risk. It will be first in priority as to existing creditors after its own secured claim following the effective date of the Plan. The nature of its claim justifies a separate classification because it

is for legal fees which grow, or have grown, with its opposition to the Plan postpetition and because it was unliquidated and contingent at the time of the petition and thereafter. Finally, if the Court confirms the Plan, it will have concluded the Plan is feasible. If the Court has found the Plan is feasible, it would be inconsistent to find that Debtor is unlikely to pay the Class 3B claims as proposed.

The comparison is thus between payment in cash on the effective date and payment over time at 14½ percent annual interest. The Court concludes the different treatment at such a high rate of interest which compensates for risk is neither unfair discrimination nor inequitable.

#### b. *Class 3A (secured)*

##### (i) Lien subordination

■ Fairfax contends the Plan violates the fair and equitable test because its lien is subject to subordination. Plan, Art. VIII and Modifications Memorandum, Para. 11. This potential, says Fairfax, violates the requirement of 11 U.S.C. § 1129(b)(2)(A)(i)(I) that the holder of a secured claim retain its lien to the extent of the allowed amount of its secured claim. The Court disagrees.

Pursuant to the Plan and the Modifications Memorandum, Fairfax retains its lien to secure its $5,000,000 secured claim. *E.g.*, Plan, Art. VIII. While a limited subordination is permitted, the conditions for the subordination do not detract from the value of lien as security for the allowed amount of Fairfax's secured claim. Under paragraph 11 of the Modifications Memorandum (Article VIII of the Plan should be amended to correct the reference to paragraph 12), Fairfax must subordinate its lien to construction financing for improvements to the Boiler and Drying Buildings. However, the subordination is only as to the lien on those two buildings, it is only for financing to construct improvements to those two buildings, and the subordination is limited to 80 percent of the improved value of the buildings, as demonstrated by a written appraisal. While Fairfax has highlighted

certain ambiguities in the language of paragraph 11 as to this last condition, counsel for Debtor has explained, and the Court accepts as the binding interpretation that the "improved" value means value added by the improvements constructed with the construction financing to which Fairfax's lien is subordinated. Further, the 80 percent of added value limitation for the lien is actual added market value, and the value determination is not limited to that shown in whatever written appraisal Debtor (or successor Facility Applicant) elects to produce.

Consequently, there is not a change in Fairfax's lien priority as to its present collateral, but only as to 80 percent of new values in two buildings. Twenty percent of such new values will accrue to Fairfax as additional protection.

Fairfax then maintains that a lien is a package of rights, and some of its other rights in the package are being modified. Consequently, the argument goes, the lien which will survive the Plan is not the same lien and not of equal value. This argument by Fairfax is too broad and sweeping. Agreements to indemnify or release officers of Fairfax which will not be part of the new package do not really negate the effectiveness of the surviving lien on Debtor's property in favor of Fairfax to protect Fairfax's allowed secured claim. Deletion of Fairfax's right to receive a percentage of gross receipts goes to the amount of its claim, not the integrity of the lien. Other modifications proposed may impact the proper interest rate to be paid, but not the lien itself. The Court for the above reasons concludes the Plan does not violate the lien preservation requirement of 11 U.S.C. § 1129(b)(2)(A)(i)(I).

### (ii) Recoupment

■ Fairfax urges the Court to reconsider its prior ruling in this case that while Fairfax may retain, as protection for ultimate payment of its allowed secured claim, the adequate protection payments it has received from Debtor, Debtor may direct them to be applied to its payment obligations for installments due under the Plan on Fairfax's allowed secured claim. *In re Sherwood Square Associates*, 87 B.R. 388 (Bkrtcy.D.Md.1988). Fairfax cites subsequent case law, and argues that the Supreme Court's decision in *United Savings Ass'n. v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) should be applied to require Fairfax to reapply the adequate protection payments to the principal amount of its debt when received, and then also to allow the full $5,000,000 amount of its secured claim, citing *Matter of Kain*, 86 B.R. 506, 17 B.C.D. 816 (Bkrtcy.W.D.Mich. 1988). The adequate protection payments ordered by Judge Mannes early in this case were based on a $2,650,000 value placed on Fairfax's collateral, which was less than the then outstanding principal amount of the debt. The $5,000,000 collateral value presently used to determine Fairfax's secured claim under the Plan reflects almost a 100 percent increase in the value of Fairfax's collateral during the pendency of this case.

The Court does not believe its prior ruling was in error in this case. The question is not whether on appropriate facts the Court could have required adequate protection payments to be applied to pre-confirmation principal balances of an undersecured creditor. Rather, the question is whether on these facts the Court must require adequate protection payments to be applied solely to principal reduction, rather than to post-confirmation amortization obligations on the unreduced principal obligation. Fairfax's position ignores the requirement that value of collateral is fixed at particular points in a case, for different purposes. It is not a cumulative concept. Under the position urged by Fairfax, it would be paid on account of its secured claim more than the value of that claim on either the date for determining its adequate protection payments or the date for allowing its secured claim, if it had been permitted to exercise its rights to foreclose on either date. Fairfax would receive both

the value of collateral earned after it wanted to foreclose, i.e. rents, and the increased value of the collateral property which was produced by the Debtor by using those cash collateral rents. Such a result is not that intended by the Bankruptcy Code, namely, to protect the secured creditor's collateral position from diminution.

## VII.

### INTEREST RATE ON SECURED DEBT

In a Chapter 11 cramdown, the Court must determine whether the discount rate proposed by a debtor-in-possession provides an objecting secured creditor with the present value of its allowed secured claim. 11 U.S.C. § 1129(b)(2)(A)(i)(II). Debtor has proposed that the $5,000,000 allowed secured claim of Fairfax shall bear interest at 9 percent per annum and shall be repaid in monthly installments of principal and interest based on a 25 year amortization, with a balloon payment in year 15. Plan, Art. V, Class 3A; Modifications Memorandum, Paras. 1 and 2 and Exhibits A and B.

Based on evidence from the confirmation hearing on the Fourth Amended Plan in the Spring of 1988, the Court "... accept[ed] the tax free rate of 9 percent for a long term obligation as satisfying the requirements of ... section [1129(b)(2)(A)(i)(II) ]". Additional Findings and Conclusions of Concerning Objections to Fourth Amended Plan at 14. Because the concept of a market rate of interest changes over time, the Court is not bound by this previous determination.

Fairfax argues that this interest rate is not sufficient to compensate it for the risks involved. The risks highlighted by Fairfax include the following:

- Fairfax claims will be subordinated to any additional debt taken on by Debtor for proposed construction of the Dryer and Boiler buildings, without a showing of a proportionate increase in the value of the real estate;

- Debtor removed various protection provisions originally contained in the loan covenants, including, *inter alia*, provisions granting Fairfax a percentage of gross revenues, placing the risk of an adverse decision on the taxability of the bonds on Debtor, and requiring a real estate tax escrow;

- Fairfax will receive less than 40 percent of its secured claim by the end of year–15.

Fairfax also contends that Debtor's expert, Dr. Donald Puglisi, incorrectly priced the instrument as a publicly traded security. Fairfax's expert, Dr. Robert O. Edmister, testified that the loan is properly classified as a mortgage collateralized commercial loan. He stated that four factors should be taken into account to fix the taxable interest rate on such a loan. These four factors, and the rates included in the composite rate which Dr. Edmister ascribed to each, are:

- Cost of money to the bank (Federal Home Loan Bank Board 11th District cost of funds) 7.59%
- Cost of term or maturity (interest rate differential for U.S. government securities with terms of one year versus 15 years) 1.67%
- Administrative Expenses (typical for savings and loan institutions) 2.02%
- Perceived Risk of Default (determined by analysis of cash flow coverage, loan to value ratio, past and current operating management and loan covenants protecting lender) 4.00%

The total taxable interest rate for payment of Fairfax's secured claim which is obtained by using Dr. Edmister's analysis is 15.28 percent. Dr. Edmister then applied a non-taxable conversion factor of 80 per-

cent, stating that he was relying upon a conversion factor used by Michael Dowd at a previous hearing. The resultant tax free discount rate promoted by Fairfax was 12.-22 percent, over a third higher than the 9 percent rate proposed by Debtor. Dr. Edmister also testified to the impact of the duration and structure of Debtor's pay out to Fairfax.

The Fifth Amended Plan (as Finally Amended) proposes payments over a fifteen year period amortized over 25 years at nine percent. At the end of year 15, Debtor will make a balloon payment of the balance due. The balloon payment will be approximately 65 percent of the $5,000,000 allowed secured claim. Underlying the nine percent interest rate is the assumption that the financing will remain tax free. Dr. Edmister testified that the risk associated with the 25 year amortization and the balloon payment vis-a-vis a 15 year amortized loan with no balloon was eight basis points or .08 of one percent on the tax free rate. He also testified that if the balloon payment was scheduled for the end of the fifth year, the term risk would be reduced by 32 basis points or .32 percent. He did not testify that the risk of default would be any different under that scenario.

Debtor's expert, Dr. Puglisi, testified that the appropriate tax free interest rate was 8.75 percent. He testified on cross-examination that his assessment of the risk associated with the "loan" to Fairfax was marginally greater than at the confirmation hearing on the Fourth Amended Plan held in March 1988 because the Debtor's debt service ratio had gone down approximately .1. The debt service ratio is the ratio of yearly cash flow to debt service. Dr. Puglisi also testified that interest rates had risen slightly since March, 1988, which had some impact on his reassessment of the appropriate interest rate. Overall, he testified the rate for the subject security would be .1 to .2 percent higher at the time of the confirmation hearing on the Fifth Amended Plan than at the time of the hearing on the Fourth Amended Plan when

the Court found the appropriate non-taxable rate to be 9 percent.

The Court previously found that Debtor's secured obligation to Fairfax has characteristics of both an asset backed security and a property specific commercial mortgage. Additional Findings and Conclusions Concerning Objections to Fourth Amended Plan at 13. The Court affirms that assessment of the obligation.

The issue of the interest rate required to afford a secured creditor fair and equitable treatment in the context of a Chapter 11 cramdown has arisen numerous times with varying results. The greater number of cases have required some form of market rate of interest in the cramdown situation in order to confirm a plan. Many cases have found *Collier on Bankruptcy* persuasive in its articulation of the standard for determining what constitutes a market interest rate. *Collier* suggests that the interest rate should be fixed as if the obligation were a coerced loan from the creditor to a third party with similar terms, collateral, duration and risk. *Collier* states:

> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for the loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

5 *Collier on Bankruptcy* para. 1129.03 (15th ed. 1988). For authorities discussing the issue, *see, e.g., United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1285 (8 Cir.1986); *In re Monnier Bros.,* 755 F.2d 1336 (8 Cir.1985) (affirming district court's decision to increase interest rate to the original contract rate of interest); *Matter of Southern States Motor Inns, Inc.,* 709 F.2d 647 (11 Cir.1983) (the interest rate to be used in computing present value of a claim pursuant to § 1129(a)(9)(C) should be the current market rate without any reduction for the rehabilitation aspects of the

plan); *In re Crane Automotive, Inc.*, 88 B.R. 81 (Bkrtcy.W.D.Pa.1988) (incorporating the analysis and reasoning of *In re Snider, infra* ); *In re Arnold,* 80 B.R. 806 (Bkrtcy.M.D.La.1987) (citing other text from *Collier on Bankruptcy* ); *In re National Real Estate Ltd. Partnership II,* 87 B.R. 986 (Bkrtcy.E.D.Wis.1988) (discussing the impact of interest rate on the possibility of successful reorganization in context of motion for relief from stay); *Matter of Kain,* 86 B.R. 506 (Bkrtcy.W.D.Mich.1988); *In re Kloberdanz,* 83 B.R. 767 (Bkrtcy.D. Colo.1988) (listing the factors discussed in *Collier on Bankruptcy* without citing the treatise); *In re Snider Farms, Inc.,* 83 B.R. 977 (Bkrtcy.N.D.Ind.1988) (Chapter 12 case); *In re 360 Inns, Ltd.,* 76 B.R. 573 (Bkrtcy.N.D.Tex.1987); *In re Noe,* 76 B.R. 675, 678 (Bkrtcy.N.D.Iowa 1987) (relying upon *Monnier Bros., supra*); Carbiener, *Present Value in Bankruptcy: The Search For An Appropriate Cramdown Discount Rate,* 32 S.D.L. Rev. 42, 64 (1987). The determination of the market rate of interest is made on a case by case basis. *Snider Farms, Inc., supra,* 83 B.R. at 992; *360 Inns, Ltd., supra.*

The Court concludes, based on the testimony, that market rate is the appropriate standard here. However, market rate does not necessarily mean the rate which this particular lender would charge on a coerced loan to Debtor because factors unique to the lender should not be controlling.

The analysis contains two components. First, there is the prevailing market rate for the loan of a term equal to the payout period proposed in the plan. Dr. Edmis-

ter's testimony indicates that this rate (taxable) would be 9.26 percent (the cost of funds plus the term risk). This base "rate should be determined as of the date of confirmation to conform to the requirement that the secured creditor receive the present value of its claim as of the effective date of the plan". *In re Noe,* 76 B.R. at 678.

Second, there is a risk premium determined by the quality of the security. *E.g., Collier* at para. 1129.03. Cases requiring a market rate of interest have considered factors from among the following in determining the risk: 1) the quality of the security [1]; 2) the loan to value ratio [2]; 3) the feasibility of the plan [3]; 4) anticipated collection cost [4]; 5) the amount of collateral [5]; 6) duration of the loan [6]; 7) risk of default [7]; 8) the credit standing of the borrower [8]; 9) the terms of the loan [9]; and 10) the existence of a guarantor [10]. Dr. Edmister testified that he considered four factors in determining a four percent risk premium: 1) cash flow, 2) loan to value ratio, 3) past and current management, and 4) loan covenants protecting the lender. The first three factors considered by Dr. Edmister in this case, although not framed exactly as the ten representative factors employed by other courts, are consistent with those ten factors. The loan covenants factor is a consideration which appears relatively novel, but has merit as the Court will discuss below.

Since the confirmation decision is an up or down decision, Courts are reluctant to state an appropriate risk premium in excess of the risk free base. It appears

---

1. *Crane Automotive,* 88 B.R. at 85; *Snider Farms, Inc.,* 83 B.R. at 990; *In re Loveridge Mach. & Tool Co., Inc.,* 36 B.R. 159 (Bkrtcy.D. Utah 1983).

2. *Crane Automotive,* 88 B.R. at 85; *Kloberdanz,* 83 B.R. at 772; *360 Inns, Ltd.,* 76 B.R. at 587–8; *but see In re Wolf,* 61 B.R. 1010 (Bkrtcy.N.D. Iowa 1986) (considering a 100 percent loan to value ratio is inappropriate in the context of dealing with an existing loan).

3. *Crane Automotive,* 88 B.R. at 85.

4. *Arnold,* 80 B.R. at 810.

5. *Kloberdanz,* 83 B.R. at 772.

6. *Kloberdanz,* 83 B.R. at 772; *Crane Automotive,* 88 B.R. at 85; *Snider Farms, Inc.,* 83 B.R. at 990; *Loveridge Mach. & Tool Co., Inc.,* 36 B.R. at 166.

7. *Kloberdanz,* 83 B.R. at 772; *Snider Farms, Inc.,* 83 B.R. at 990.

8. *360 Inns, Ltd.,* 76 B.R. at 588.

9. *360 Inns, Ltd.,* 76 B.R. at 588.

10. *Loveridge Mach. & Tool Co., Inc.,* 36 B.R. at 166.

generally though that risk premiums determined or approved by the courts are judgments made within acceptable ranges based on the facts in a particular case as of a particular time.

The Court views the risk for which a premium is factored into the interest rate, not as the risk of default in its broad sense, as estimated by Dr. Edmister, but as the risk of nonrecovery or noncollectability. This different perspective reflects the purpose of the premium in a bankruptcy proceeding as contrasted to the purpose of a lending institution in pricing the terms on which it would choose to make a new loan. The costs of collection in the event of default should not be included in fixing a rate of return under a Plan. The risk of incurring collection costs in the event of default for this loan was factored in by the lender, spread over all similar loans, in pricing this loan initially. The question now is what is the risk that Fairfax will not recover its allowed secured claim. The Court believes that this risk is not great. Indeed, in the context of its absolute priority rule argument, Fairfax, through cross-examination of Michael Dowd, developed an argument that the terminal value of the collateral at the end of 15 years might be approximately $9,000,000, net of the balloon payment. Fairfax's expert appraiser, Mr. Lipman, testified that the present value of this terminal value would be approximately $985,-000 using a 15 percent discount rate, or $651,000 using an 18 percent discount rate. If future value of this amount exists, Fairfax's risk of noncollectability must be relatively low.

■ Further, when a bank lends money to a commercial enterprise, the bank will either collect the debt it is owed or it will not. If a borrower defaults on a loan, the risk premium on that specific loan does not make the lender whole. Instead, the risk premium charged by the bank is like an insurance premium—protecting the bank against the default of some percentage of the thousands of loans it makes each year. Therefore, the risk premium is associated with a type of borrower—high risk versus low risk—not a specific loan. In this case,

the rate should be set for this specific loan. Debtor should not be penalized for the batting average of defaults on loans to borrowers of the same type as Debtor. As such, the Court will not add a risk premium in this case for the risk of noncollectability, because the Court holds that Fairfax faces minimal risk of ultimately not collecting its allowed secured claim.

The analysis does not end here. Fairfax contends that it was afforded protections through various loan covenants that do not exist under the Fifth Amended Plan (As Finally Amended). For instance, the tax escrow no longer exists. Further, the burden of contesting a finding by the I.R.S. that the bonds were taxable was placed solely on Debtor. The language of that provision has been modified in the Modifications Memorandum and contains language subject to interpretation. Fairfax should be compensated for these modifications, although they appear to have minor impact on collectibility. *See In re Nolen Tool Co.*, 50 B.R. 488 (Bkrtcy.W.D.Ark. 1985). The Court concludes an appropriate risk premium, excluding that associated with the balloon payment, is one percent. The term risk is a separate factor as discussed above.

As to administrative expenses, the Court finds Dr. Edmister's testimony persuasive on this issue and will include his uncontroverted 2.02 percent administrative expense factor. Fairfax's cost of raising capital to fund the credit is ongoing. The administrative expense factor represents an allocation of the costs associated with raising the capital to fund the loan as long as it is unpaid. The Court will use Dr. Edmister's percentage amount, an average amount for all savings institutions, in the absence of any other amount presented for consideration.

Thus, the Court holds that the taxable market rate of interest associated with this loan specifically is 12.28 percent, plus the additional risk created by the balloon payment. This percentage must be converted from taxable to non-taxable. The highest conversion factor discussed at the confirmation hearing was 80 percent. Dr. Ed-

mister testified that his independent view of the appropriate non-taxable difference factor was 23.8 percent, as of September 19, 1988 Moody's quotations. Debtor argues that the conversion factor should be 71 percent, i.e. a 29 percent difference. Debtor's Exhibit 2, October 1988. Apparently, the conversion ratio for taxable rates to nontaxable rates reflected in the market varies slightly from time to time.

The Court concludes that the appropriate conversion factor is 76.2 percent based on Dr. Edmister's contemporaneous opinion, resulting in a tax free market interest rate for this specific loan, before the balloon factor, of 9.36 percent. To this rate should be added the .08 percent tax free risk factor for the balloon payment testified to by Dr. Edmister. Therefore, a minimum tax free interest rate to provide a fair and equitable rate of return to Fairfax is 9.44 percent. The 9 percent rate proposed by Debtor does not afford fair and equitable treatment to Fairfax as required by 11 U.S.C. § 1129(b)(2).

## VIII.

### ABSOLUTE PRIORITY RULE

Fairfax's last objection to the confirmation to the Plan is that it violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B). Fairfax states in summary that

> ... under the Plan, the Investment Partnership escapes paying the $1.8 million it was originally obligated to contribute to the Partnership, receives full repayment (with interest) of the alleged $1.6 million loan/capital contribution and, along with the rest of Class 8, will retain its ownership benefits, *i.e.*, future profits, worth at least $600,000 without making *any* new capital contributions.

Fairfax Memorandum at 50. The absolute priority rule applies only to unsecured claims and interests, but Fairfax states that "[t]he applicability of the absolute priority rule to Fairfax is not wholly determined by the allowance of Fairfax's Class 3B [unsecured] claim." Fairfax Memorandum at 41. Fairfax contends that since it is undersecured, the absolute priority rule

applies because the Plan does not repay all contractual interest, in that post-petition interest is not allowed as part of the unsecured portion of its claim. 11 U.S.C. § 502(b)(2).

The Ellerin parties also object to the Plan as not in compliance with the absolute priority rule. They are insider unsecured creditors in Class 5 which are subordinated to non-insider unsecured creditors. They object to the Plan provisions which may allow junior Class 8 contributing partners to retain their partnership interests and thus the benefits of the residual values in the reorganized project. These residual benefits could have a discounted present value from $450,000 to as high as $985,000 (based on a 15 percent internal rate of return for Debtor's March, 1988 projections), depending on the interest rate assumptions which are used. *See* Lipman testimony.

Debtor counters by arguing that the absolute priority rule is inapplicable in this case because Debtor's present, unreorganized net worth is approximately negative $2,000,000. Debtor also argues that the exception to the absolute priority rule— that equity holders may keep their interests by contributing an amount of new capital at confirmation that exceeds the value of the interests retained—applies here. Debtor asserts Class 8 will contribute $300,000 in fresh value.

The Plan provides that the Investment Partnership and other entities which constitute Class 8 will, on the Consummation Date, contribute a total of $300,000 as capital contributions. Loans to Debtor by the Investment Partnership prior to confirmation may offset these capital contributions. Plan, Art. VII. However, as discussed previously (*supra*, Part I(a)), before any payments may be made on these loans, the Bankruptcy Court must determine that they are authorized administrative expenses. The Class 8 contributing partners will retain their partnership interests in consideration of these capital contributions of cash and loans. Plan, Art. V.

■ If the loans to be repaid are allowed administrative expenses which have priority for repayment ahead of unsecured claims and may insist on repayment on the Plan's effective date (11 U.S.C. § 1129(a)(9)(A)), and those loans are forgiven, the forgiveness is the functional equivalent of a cash contribution of capital which is used to repay the same loan. Therefore, the Plan is not objectionable because it allows authorized administrative expense obligations to be set off against capital contributions.

■ The partners of the Investment Partnership may preserve tax benefits or avoid adverse tax consequences, which are personal to them, if the Plan is consummated. These tax benefits are not something from which Debtor itself may directly benefit. They may be a motivation for partners to sponsor the Plan, but these personal tax benefits do not constitute receipt or retention of an interest in property of the Debtor for Class 8 interests. Therefore, retention of these tax benefits, in and of themselves, does not constitute a violation of the absolute priority rule.

Repayment of other loans made by the Class 8 contributing partners is not a violation of the absolute priority rule if those loans have received Court approval as administrative obligations of the bankruptcy estate, which is what the Plan provides. Such repayment would be on account of the approved loans, and not on account of the holders' Class 8 interests.

■ The principal remaining question is whether a $300,000 payment by the Class 8 interests is fair value to satisfy an infusion-of-new capital exception to the absolute priority rule. *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), particularly at note 3; *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Is $300,000 fair value in exchange for the control and future prospects of the Debtor, even though the current value of the Debtor's assets is less than its debts, both before reorganization and at the effective date of the Plan. *See Ahlers, supra,* at part III(B).

Here, the $300,000 capital contribution by the interest holders is less than various estimates of the residual value of Debtor's project. However, those residual values are based on Debtor's projections, which have been challenged as too optimistic. Debtor's projections are also, at least in the short term, more optimistic than those used by Debtor's appraisal expert, Mr. Payne, whose $5,000,000 market value for Debtor's project, Sherwood Square, the Court has accepted for purposes of this Plan.

The $5,000,000 present market value which the Court has accepted for Sherwood Square was developed by Mr. Payne with primary reliance on the capitalization of income less expenses method. Residual values are estimated using similar factors, .e.g., projected income and interest rates. The Court has determined that, at $5,000,-000 for Fairfax's claim secured by the present market value of $5,000,000 for Sherwood Square, the project does not have positive equity values. Rather, the alleged residual values are prospective values estimated based on optimistic income and expense projections. As such, the $300,000 capital infusion is substantial for the opportunity to generate the hoped-for residual values described earlier in this section. This sum represents a fair allocation of future values between present interest holders who invest new capital and creditors who receive the benefit of such new investment. Therefore, the retention by Class 8 of their equity interests in the Debtor does not itself violate the absolute priority rule since the fair value exception applies.

The final issue is whether, apart from the benefits of future profits and residual values, if generated, Class 8 interest holders should have unfettered access to excess cash flow. The answer is no. There must be some restriction. Otherwise, Class 8 interest holders would receive Debtor's property on account of their interests ahead of creditors in violation of the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii). Since the Plan contains no restriction on the ability of partners to withdraw cash flow, and since the testimo-

ny of Michael Dowd is that the only limitation on such distributions would be the Debtor's need to finance improvements in his discretion, the Plan may not be confirmed without the addition of restrictions on upstreaming excess cash flow ahead of the payment of creditors. Excess cash flow is contrasted to future profits and realized appreciation.

## IX.

## CONCLUSION

For the reasons set forth herein, the Court declines to confirm Debtor's Fifth Amended Plan of Reorganization (as Finally Amended), as presently constituted.