**In re Phillip H. ARNOLD, Carol B. Arnold, Debtors.**

**Bankruptcy No. 87–00467.**

United States Bankruptcy Court, M.D. Louisiana.

Nov. 23, 1987.

Jack Patrick Harris, Baton Rouge, La., for debtors.

## REASONS FOR DECISION

WESLEY W. STEEN, Bankruptcy Judge.

### I. Jurisdiction of the Court

This is a proceeding arising under Title 11 U.S.C. The United States District Court for the Middle District of Louisiana has original jurisdiction pursuant to 28 U.S.C. § 1334(b). By Local Rule 29, under the authority of 28 U.S.C. § 157(a), the United States District Court for the Middle District of Louisiana referred all such cases to the Bankruptcy Judge for the district and ordered the Bankruptcy Judge to exercise all authority permitted by 28 U.S.C. § 157.

This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(L); pursuant to 28 U.S.C. § 157(b)(1), the Bankruptcy Judge for this district may hear and determine all core proceedings arising in a case under Title 11 referred under 28 U.S.C. § 157(a), and the Bankruptcy Judge may enter appropriate orders and judgments.

No party has objected to the exercise of jurisdiction by the Bankruptcy Judge. No party has filed a motion for discretionary abstention pursuant to 28 U.S.C. § 1334(c)(1) or pursuant to 11 U.S.C. § 305. No party filed a timely motion for mandatory abstention under 28 U.S.C. § 1334(c)(2). No party has filed a motion under 28 U.S.C. § 157(d) to withdraw all or part of the case or any proceeding thereunder, and the District Court has not done so on its own motion.

### II. Status

A confirmation hearing was held on October 16, 1987, concerning the plan of reorganization proposed by the Debtors in this case. The Debtors proposed a number of plan amendments at the confirmation hearing. Because of numerous changes in the plan and confusion concerning the Debtors' projections of income available to fund the plan, the Debtors were required to amend the plan to conform with the oral amendment stated at the October 16 hearing and the Debtors were required to file a restated plan with additional documentation concerning interest rates. The Debtors complied timely, and an additional hearing was held on October 27, at which time the Debtors presented evidence concerning feasibility. I conclude that the Debtors have proved, by a preponderance of the evidence, that the requirements of § 1129(a)(1), (2), (3), (4), (5), (6), (7), (9), (10), and (11) are met. However, I conclude that the requirements of § 1129(a)(8) have not been met. In addition, with respect to the classes that have not accepted the plan, I conclude that the provisions of § 1129(b)

**808**

have not been met. Therefore, I conclude that the plan cannot be confirmed.

### III. Facts

The following classes have not accepted the plan: Classes 4, 9, 10, 11, 12, 18, 19, 22, 24, 27, 29, 36, 37, and 41. The plan can be confirmed, therefore, only if the Court concludes that with respect to the rejecting secured classes the plan meets one of the requirements of § 1129(b)(2)(A).[1]

### IV. Conclusions

#### A. Section 1129(b)(2)(A)(iii) Payment by Abandonment

■ With respect to some of the nonaccepting classes, the Debtors propose to abandon collateral in satisfaction of part of the indebtedness and to pay the remainder either in installments or in a lump sum. In a prior opinion [2] I concluded that a transfer of property in payment of a secured debt does not meet the indubitable equivalence test of § 1129(b)(2)(A)(iii); the *Arnold* plan differs from the plan considered in *Sandy Ridge* only in that the Debtor proposes to "abandon in satisfaction" instead of "transferring in satisfaction" of the indebtedness. The Debtor is in error if the Debtor has read the *Sandy Ridge* opinion as concluding that abandonment in satisfaction of a claim satisfies the requirements of § 1129(b)(2)(A)(iii). The key element that I found in the Sandy Ridge plan to offend the § 1129 indubitable equivalence requirement is not the transfer of the property instead of abandonment; rather I concluded that the plan did not meet the indubitable equivalence test because it provided (without consent of the claimant) for satisfaction of the claim, with potential consequences beyond those permissible in a plan of reorganization.

As noted in the prior opinion, the House Committee Report indicates the abandonment of property subject to a security interest meets the requirements of § 1129(b) with respect to the secured claim.[3] The abandonment of property to a secured creditor meets the indubitable equivalence test since it provides to that creditor all of the rights that the creditor has under state law with respect to his collateral and therefore the creditor has received the indubitable equivalent of his secured claim. The bankruptcy court then has the authority to determine the amount of the unsecured claim. The unsecured claim is either paid or discharged in accordance with the plan and § 1129(b)(2)(B) and thus the plan is properly limited to restructure of debts and discharge of debts with the Debtor *vis a vis* the creditor.

The provisions of the Debtors' plan are substantially different. Under the Debtors' proposal there is the *satisfaction* of a secured claim; the creditor's other rights, if any,[4] are potentially affected. What the Debtor has done, in effect, by abandoning collateral in satisfaction of debt is to change the words but to provide for the same effect that the Debtor in *Sandy Ridge* had planned. I conclude that the process is fatally deficient for the same reasons that I stated in *Sandy Ridge:* that is, involuntary satisfaction of secured indebtedness and the elimination of rights against guarantors or other collateral to the extent of a "deemed payment" based on a court valuation of property depending on appraisal testimony is not the indubitable equivalent of a creditor's claim.

#### B. Section 1129(b)(2)(A)(i) Payment–Present Value

■ With respect to other secured claims, the debt is simply restructured. The debt is extended to twenty years with a 9% interest rate. In order to confirm the plan under § 1129(b)(2)(A)(i), the Court must conclude that a stream of payments

---

**1.** The Debtor proposes the use of § 1129(b)(2)(A)(i) or (iii) or a combination of those two.

**2.** *In re Sandy Ridge Development Corporation,* 77 B.R. 69, 16 B.C.D. 340 (Bkrtcy., M.D.La., 1987).

**3.** Presumably this would only occur with respect to an undersecured claim since, as de-

scribed in the *Sandy Ridge* opinion, a secured claim cannot be *over* paid without violating the fair and equitable requirements of § 1129(b) over the dissent of a junior class.

**4.** Such as claims against guarantors, rights against other collateral, *etc.*

over twenty years with a 9% interest rate provides the secured creditor with the present value of his claim. I conclude that this test is not met.

### 1. Present Value Discount Rate Proposed by the Debtor—The Case for Nonprofit Loans

The critical element in this analysis is a determination of an interest rate so that the stream of payments over the term of the note will equal the present value of the claim as of the effective date of the plan. Congress has not provided any guidance about how the interest rate should be computed. The Debtor has provided a law review article, 32 *So. Dakota L.Rev.* 42 "Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate." That article discusses the jurisprudence and concludes that the appropriate interest rate is computed by adding a risk premium to the U.S. Government securities interest rate for an appropriate term. Because government bonds are not amortizing obligations, the article concludes that the Court should adopt the interest rate applicable to a government obligation with a term determined by financial calculations based on the principal outstanding under the plan provisions for amortization of the loan.[5] I reject the conclusions in the article and thus the Debtor's contentions because the author's conclusions do not survive careful analysis.

First, the author makes several rather bold, and bald, assumptions:

(1) "... the [interest] rates based on government securities do not contain a premium for profit."[6] If the author means that there is no profit element for the buyer of government bonds, the conclusion would no doubt be contrary to the intent and objective of bond buyers;[7] one would think that most purchasers buy bonds to make a profit. If the author means that the rates do not contain a profit for the government, then the author has his roles reversed; in the government securities market the government is the borrower (*e.g.* the debtor), not the lender.

(2) "These rates are unique as they are set by the borrower, and they require the creditor to forego a lender's profit in return for a risk-free investment."[8] This statement is made without authority and reaches some rather startling conclusions. First, it is unclear what authority convinces the author that the rates on government securities are set by the borrower; the borrower, obviously, is the United States. Although the United States, through various agencies and instrumentalities[9] has some influence on interest rates, it is simplistic to argue that the United States Treasury securities market operates merely by the Treasury's setting the rate at which it will issue securities. It is common knowledge that government bonds are issued with a stated interest rate, but the purchase price may include a premium or a discount. In the short-term securities market (*i.e.* T-bills), there is no stated interest rate; the rate of return is established by discounting the principal, and the discount is set by auction, not by the issuer. Second, it is rather startling that the government securities are considered a "risk-free investment." Although it is certainly true that the government securities are considered to have the least risk of default, it is also true that default is but one of several risks attendant to fixed income securities: there is the risk of inflation to reduce the value of the principal to be repaid in the future; there is the risk of loss if interest rate increases and if the instrument must be sold prior to maturity to meet a liquidity need, *etc.* Third, the author believes that an interest rate set by a borrower is superior to an interest rate set

---

5. 32 *So. Dakota L.Rev.* 42, 63–65.

6. 32 *So. Dakota L.Rev.* 42, 60.

7. Although it might not be contrary to their experience over the past decade due to market declines.

8. 32 *So. Dakota L.Rev.* 42, 60.

9. Such as the Federal Reserve Open Market Committee, fiscal policy established by the Congress and the President, the support of the dollar through foreign currency transactions, and in an unlimited multitude of other ways.

by a lender because the latter rate includes a profit for the lender which is not appropriate in the bankruptcy context. While the author of the law review article may have some personal objection to a lender making a profit, I am under a duty to interpret a statute rather than to indulge my preference, and I find no authority for such a proposition in the Bankruptcy Code; the author cites no authority for his proposed rule of law.

(3) The author also concludes that the interest rate applicable for determination of present values should not include any sums to cover "the cost of pursuing delinquent borrowers." The author concludes that "collection costs are ... eliminated or reduced [in bankruptcy cases] because the creditor has received a continuing judicial remedy which, upon default, allows the creditor to bypass much of the collection process." The author concludes that there is no substantial risk to a creditor of loss "in a bankruptcy reorganization, [because] all aspects of the debtor's ability to service his debts are made available to the creditor." The authority for this last sentence, in particular, is rather amazing. It is preposterous to conclude that a creditor has little or no collection cost and risk in bankruptcy because the debtor is in a bankruptcy reorganization proceeding.[10]

Another flaw in the cited article lies in the computation of interest rates in a nonprofit world: the concept of "cost of funds." As noted above, the law review article, and the Debtor in this case, propose that the creditor should not make a profit on his coerced (cramdown) bankruptcy loan to the debtor.

To implement this nonprofit "principle", the interest rate paid by the Debtor would equal the cost of funds to the creditor. The proponents of the "nonprofit loan principle" would compute the lender's cost of funds by using the lender's minimum cost of funds; they then argue that the lender should pass along this direct cost of funds

to the borrower, perhaps with the addition of an arbitrary, but minimum, surcharge.

The analysis is simplistic. First, the direct cost of funds to a lender might have many elements: short-term deposits, long-term deposits recently received, long-term deposits held from an earlier era of different interest rates, discount window advances, shareholders' capital, commercial paper, long-term debt, publicly-held debt, etc. Each of these would involve different interest rates. I can find no authority why a debtor in bankruptcy should reap the benefit of the least costly source of funds. Second, the "cost of funds" includes more than the direct cost, just as a retailer's cost of any item includes more than the direct cost of purchasing the inventory. These indirect or overhead costs (which include more than simply risk and collection costs) are charged to all customers through a markup; any portion of these costs not paid by one customer must be suffered by other customers or by the proprietor. I see no authority to coerce other borrowers and the proprietor to suffer more than their pro rata share of these costs. Third, the low rates usually emphasized for computation of these rates (such as CD rates or discount window advances), usually have extremely short terms (a few days or months) as compared with the twenty-year term that the Debtor proposes to fix for himself. There is no guarantee that during this twenty-year period we will not return to the experience of the first years of this decade when the prime rate was approaching 20% (contrasted with today's rate at about 9.5%).

The falacy of the "nonprofit loan" principle is dramatically illustrated by the evidence in this case. The Debtor contends that 9% is an appropriate discount rate under the nonprofit loan theory since commercial paper and Certificate of Deposit rates (at which some of the lenders could acquire funds) is less than 7%. One of the creditors, Crestar, testified that its total cost of funds, after consideration of the

---

10. *In re Timbers of Inwood Forest Associates, Ltd.,* 793 F.2d 1380 (5th Cir., 1986) (panel opinion); 808 F.2d 363 (5th Cir., 1987) (*en banc* opinion). Footnote 17 of the *en banc* majority opinion states that only 5% of the Chapter 11 cases in the Fifth Circuit were fully administered; *i.e.* not converted or dismissed.

mix of various sources of funds and overhead costs, is 10.41% on a ten-year loan. A 9% loan would be loss to Crestar. I see no authority to require a creditor to lend to the Debtor at a loss. In addition, not all lenders are commercial institutions with access to funds at the low cost end. Some lenders (such as individuals) do not have access to these low cost funds. Acceptance of the Debtors' proposition would mean a different discount rate for each creditor, or an arbitrary rate that could mean an actual loss to some lenders. Establishment of a different rate for each lender would be an administrative nightmare. Use of an arbitrary rate destroys the theoretical base on which it is built because that practice could actually result in enforced losses for some creditors justified by a theory that a creditor should not profit in a reorganization.

### 2. Present Value Discount Rate—Collier's and the Circuit Courts of Appeal

The reasoning of the most respected authority in the field [11] is much more convincing. Collier's concludes that the appropriate rate with which to discount the payments under the plan is the rate of interest applicable to a hypothetical borrower involving similar risks, term, and quality of security. The proper analysis is as follows. The statute provides that the creditor must "... receive ... deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." [12] The legislative history states:

"Application of the test under subparagraph (A) ... requires a valuation of the consideration 'as of the effective date of the plan'. This contemplates a present value analysis that will discount value to be received in the future; of course, if the interest rate paid is equivalent to the discount rate used, the present value and face future value will be identical. On

the other hand, if no interest is proposed to be paid, the present value will be less than the face future value. For example, consider an allowed secured claim of $1,000 in a class by itself. One plan could propose to pay $1,000 on account of this claim as of the effective date of the plan. Another plan could propose to give a note with a $1,000 face amount due five years after the effective date of the plan on account of this claim. A third plan could propose to give a note in a face amount of $1,000 due five years from the effective date of the plan plus six percent annual interest commencing on the effective date of the plan on account of this claim. The first plan clearly meets the requirements of subparagraph (A) because the amount received on account of the secured claim has an equivalent present value as of the effective date of the plan equal to the allowed amount of such claim.

"The second plan also meets the requirements of subparagraph (A) because the present value of the five years note as of the effective date of the plan will never exceed the allowed amount of the secured claim; the higher the discount rate, the less present value the note will have. Whether the third plan complies with subparagraph (A) depends on whether the discount rate is less than six percent." [13]

Collier's states:

"The legislative history explains the mechanical aspects of discounting future cash payments by a specified discount rate which is a relatively simple mathematical process. However, determining the appropriate discount rate is a considerably more complicated matter.

"The concept of 'present value' is of paramount importance to an understanding of section 1129(b). Simply stated, 'present value' is a term of art for an almost self evident proposition: a dollar in hand today is worth more than a dollar

**11.** Collier's on Bankruptcy, 15th Ed., ¶ 1129.03[i], pp. 1129–60 through 1129–66.

**12.** § 1129(b)(2)(A)(i).

**13.** H.R.Rep. No. 595, 95th Cong., 1st Sess. 414–415 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6370–6371.

to be received a day, a month or a year hence. Part of the 'present value' concept may be expressed by a corollary proposition: a dollar in hand today is worth exactly the same as (1) a dollar to be received a day, a month or a year hence plus (2) the rate of interest which the dollar would earn if invested at an appropriate interest rate.

"The problem with the corollary proposition is that it only says that a dollar has investment value measured by the amount that the market will pay for the use of the dollar. The actual rate of interest on a dollar is determined by the risks which the lender is willing and able to assume.

"The concept of 'present value' does not define, and thus the court must determine, based on the facts of a given case, the appropriate 'market rate' which will serve as the measuring standard by which the court can determine whether deferred payments under the terms of the plan have a value as of the effective date of the plan equal to the allowed claim.

"*It is submitted that deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. It is therefore submitted that the appropriate discount rate must be determined by reference to the 'market' interest rate.*" [14] [Emphasis supplied.]

The thoughtful bankruptcy court opinions (and all Circuit Courts of Appeal opinions on point) have accepted the *Collier* analysis:

*Matter of Southern States Motor Inns, Inc.* [15] interpreted language identical to § 1129(b)(2)(A)(i); the case involved a tax claim, however, and, therefore, the statutory cite is § 1129(a)(9). Nevertheless, the issue was how to determine the appropriate interest rate for computation of the present value of a future stream of payments. The bankruptcy judge (affirmed by the district court) held that the statutory interest rate applicable to tax deficiencies would apply, but the bankruptcy judge deducted 1% from that rate for Congressionally intended "rehabilitation aspects" the bankruptcy judge perceived in Chapter 11. The circuit court *reversed* and *held:* (1) The relevant factors are correctly stated by *Collier's* (the circuit court quoted the language emphasized in the *Collier's* quote above). The Court stated:

"We believe Congress intended that creditors required to accept deferred payments ... should be placed in as good a position as they would have been had the present value of their claims been paid immediately. Consequently, we hold that the interest rate to be used in computing present value of a claim ... should be the current market rate without any reduction for the 'rehabilitation aspects' of the plan." [16]

*In re Monnier Bros.* [17] involved cramdown of a Chapter 11 plan on an oversecured creditor. The loan had been closed only twenty months before plan confirmation. The evidence at trial consisted of two presentations: (i) the debtor introduced a page from the *Wall Street Journal* showing the prime rate, federal funds rate, commercial paper rate, certificates of deposit rate, and treasury bill rate; (ii) the creditor introduced a copy of its note showing the contractual rate of interest. Citing *Southern States*, the Eighth Circuit essentially concluded that the debtor's evidence was not relevant since it concluded that the district court was correct in using the twenty-month old contract rate because the district court was "*[l]acking any evidence correlating other rates with the 'coerced loan' contemplated by the plan.*" [18] In

14. *Collier's on Bankruptcy,* 15th Ed. ¶ 1129.03.

15. 709 F.2d 647 (11th Cir., 1983).

16. *Matter of Southern States Motor Inns, Inc.,* 709 F.2d 647, 652 (11th Cir., 1983).

17. 755 F.2d 1336 (8th Cir., 1985).

18. 755 F.2d 1336, 1339.

*United States v. Neal Pharmacal Co.* [19] the Eighth Circuit reaffirmed its holding in *Monnier Bros.* and held that it was *reversible error* for the bankruptcy judge to base the present value discount rate on the lender's cost of funds.[20]

The testimony at trial was that the market rate for loans of the type provided in the plan for nonaccepting creditors is substantially more than 9%, approaching 12% to 14%.[21] Therefore, the plan does meet the requirements of § 1129(b)(2)(A) since it does not provide the creditor with a present value of his collateral.

While some of the other objections of creditors, including the unfairness of extending demand notes for substantial periods of time, seem to have some merit, I will not address those since the reasons given so far are dispositive of the denial of plan confirmation. A separate order has been entered.

19. 789 F.2d 1283 (8th Cir., 1986).

20. "The bankruptcy court's sole reliance on the government's cost of borrowing without consideration of the risk of nonpayment, the length of the payment period, and the existence of collateral is clearly contrary to the prevailing market rate approach referred to in *Monnier Bros.* and adopted by other courts ..." 789 F.2d 1283, 1286.

21. While the testimony provided a number of different interest rates, all of the testimony about *market rates* on *equivalent loans* indicated that the rate was above 9%. The Debtor's evidence related to "nonprofit loans." Since I reject that basis for present value computations under § 1129(b)(2)(A), and since I conclude that the market rate is something in excess of 9%, I need find no further facts since a 9% interest rate will not meet the § 1129(b)(2)(A) test under such circumstances. However, for purposes of a complete record on appeal, I find that the market rate on a twenty-year loan secured by rental residential real estate in the range of 12%–14% depending on computation of points,

*etc.* Collier's, ¶ 1129.03[i] explains the analysis this way:

"If the debtor proposes to pay the outstanding balance of the mortgage (*i.e.*, $750,000) five years from the date of confirmation with interest at 6 percent per annum payable on the payment date the court would have to determine whether $750,000 plus 6% interest payable in five years and compounded annually has a present value equal to $750,000 paid on the effective date of the plan. If the market interest rate on mortgage loans secured by property of the quality of the creditor's collateral is 12%, the plan fails the section 1129(b)(2)(A) test because the future payments must be discounted at the market rate of 12% and not the rate specified in the plan of 6%. *When discounted at any rate in excess of 6 percent, the present value of the note must be less than $750.000.*" [Emphasis supplied.] The legislative history quoted in the main text above explains that merely finding that the market rate is above the debtor's proposed rate is enough to deny plan confirmation. *See also Monnier Bros., supra.*