**In re CONSUL RESTAURANT CORPORATION, Debtor.**

**Bankruptcy No. 3–91–4902.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Oct. 10, 1992.

Michael Meyer, Ravich Meyer Kirkman & McGrath, Minneapolis, Minn., for debtor.

Margaret Mahoney, Craig Averch, Weil, Gotshal, & Manges, Dallas, Tex., for UCC Committee.

Daryle L. Uphoff, Robert Raschke, Lindquist & Vennum, Minneapolis, Minn., for Chi–Chi's, Inc.

Charles Nauen, Opperman, Heins & Paquin, Minneapolis, Minn., for Circle Business Credit.

Virginia Bell, Maslon Edelman Borman Brand, Minneapolis, Minn., for Nat. City Bank.

William Connors, Fredrikson & Byron, Minneapolis, Minn., for American Bank Mankato.

## ORDER

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter is before the Court on contested confirmation hearing of two competing plans. One plan is proposed by the Debtor and the Unsecured Creditor's Committee (Joint Plan); the other by the Debtor's franchisor, Chi–Chi's Incorporated (Chi–Chi's Plan). Appearances are noted in the record. The Court, having heard and received all relevant evidence, and having heard arguments and reviewed briefs submitted by the parties, now being fully advised in the matter, makes this ORDER pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I.

### THE JOINT PLAN

*Brief History.*

Consul Restaurant Corporation is a public corporation that holds a franchise to construct and operate Chi–Chi's Mexican style restaurants within a defined territory in the United States and, until recently, in Canada. The Debtor was organized for

that purpose in 1978. At filing of the case, there existed a total of 16,500,000 outstanding common shares of the Debtor.

Beginning in 1983, under former management, the Debtor began an aggressive expansion program of restaurants (stores) within its franchise territory.[1] At its peak development and operation, the Debtor owned and operated as many as 52 stores in the United States and Canada. Financial difficulties ensued, in large part the result of an inadequate management infrastructure to deal with and supervise its growing geographically diverse operations, and inadequate capitalization. Management's response strategy to its problems was an attempt to "grow out of them" through more expansion.

By June 1991, it became apparent to the Debtor's board of directors that the strategy would fail and, under new management, the Debtor determined to reverse its course. A petition was filed under 11 U.S.C. Chapter 11 on September 1, 1991, and the Debtor began a program of market and store-by-store analysis with the objective of shrinking its geographic market and divesting itself of unprofitable stores. During pendency of the case, the Debtor sold its Canadian operation and gave up the Canadian franchise. It also shrank the U.S. franchise to its midwest core area and took steps to sell or close unprofitable stores both within and without the core area. The Joint Plan proposes a reorganized operation of 21 stores in its core area, with future expansion under its franchise agreement within the core area of eight more stores over a four year period.

*The Plan.*

Following is the Joint Plan's classification of claims and interests in the amounts determined by the Court for purposes of considering confirmation issues regarding the Plan:

Class 1—Priority Non–tax Claims.
$1,300,000 Administrative.

Class 2—American Bank Mankato Claim.
$300,000 fully secured real estate.

Class 3—Chrysler Capital Claim.
$2,425,544 fully secured real estate and personal property.

Class 4—First National Bank Claim.
$68,000 fully secured personal property.

Class 5—Ford Motor Credit Claim.
$9,000 unimpaired.

Class 5A—GMAC Claim.
$10,400 unimpaired.

Class 6—Circle Business Credit Claim.
6A Secured $1,200,000 personal property.[2]
6B Unsecured $1,094,000 subordinating debt to Classes 7, 8.[3]

Class 7—Senior Debentures.
Unsecured $6,233,000 subordinating debt to Class 8.

Class 8—Subordinated Debentures.
Unsecured $3,249,000.

Class 9—General Unsecured Claims.
$6,293,000.

Class 10—Administrative Convenience Claims.
$200,000.

Class 11—Old Preferred Stock

Class 12—Old Common Stock

1. The Debtor held a large geographic territory in the United States, including Southern California, Oregon, Washington, Texas, Louisiana and what would later come to be referred to as its core area of key states in the upper midwest. Additionally, it held an exclusive franchise covering much of Canada.

2. The parties dispute the allowable amount of this claim. The Debtor contends that postpetition adequate protection payments reduced the principal to $960,000. CBC argues that the postpetition payments simply maintained the status quo. The issue is not addressed in this opinion, since resolution of the case is controlled by determination of other issues.

3. The Debtor claims that only $400,000 of this amount is senior subordinating debt. However, the entire debt is of the type covered by the contract documents as subordinating debt, and the Debtor, until confirmation, recognized that by separately classifying the entire unsecured amount. If only $400,000 is subordinating debt, then the balance of $694,000 should have been classified with the general unsecured Class 9. No legitimate purpose has been stated for classification of CBC's unsecured debt separately from Class 9 other than its senior subordinating rights regarding Classes 7 and 8.

Class 13—Equity Interests (not including Old Pref. Stock and Old Common Stock).

Classes 2, 3, 4, 8, 9, 10 and 11 voted to accept the Plan, while Classes 6 and 7 voted to reject it. Additionally, Class 6 objected to confirmation on legal grounds of unfair discrimination and failure to meet the fair and equitable standard; and, Class 7 filed a post-hearing brief expressing concern that the Plan might not comply with its absolute priority rights. Chi–Chi's filed similar objections and also objected on grounds of feasibility.

Following is a general presentation of the Joint Plan's proposed payment and treatment of claims and interests on the effective date of the Plan:

Class 2—American Bank Mankato Claim, fully secured note 5 year term.

Class 3—Chrysler Capital Claim, fully secured note 12 year amort., balloon 10th year.

Class 4—First National Bank Claim, fully secured note 5 year term.

Class 5—Ford Motor Credit Claim, fully secured note per contract.

Class 5A—GMAC Claim, fully secured note per contract.

Class 6—Circle Business Credit Claim.
6A, secured note, 12 year amort., balloon end of 7th year.
6B, $400,000 cash, 321,000 new equity shares, unsecured note to the extent present value of new shares is less than $2.16 per share.

Class 7—Senior Debentures, $1,469,000 cash, 1,518,000 shares new equity, $997,000 unsecured note.

Class 8—Subordinated Debentures, 820,000 shares new equity, 263,000 contingent warrants.

Class 9—General Unsecured Claims, $1,131,000 cash, 1,608,000 shares new equity.

Class 10—Administrative Convenience Claims, $120,000 cash.

Class 11—Old Preferred Stock, 0.

Class 12—Old Common Stock, 0.[4]

Class 13—Equity Interests (not including Old Pref. Stock and Old Common Stock), 0.

Classes 7 and 8 are subordinated by prepetition agreement to CBC's Class 6 unsecured claim. Class 8 is subordinated by prepetition agreement to the Senior Debentures Class 7 claims. Classes 6B, 7, and 8 are of equal priority with the Class 9 General Unsecured Claims.

CBC argues that the payment and distribution scheme of the Joint Plan is unfairly discriminatory against it, and is not fair and equitable, because it does not recognize CBC's subordination rights as to Classes 7 and 8. CBC notes that the proposed cash payment to its subordinated Class 7 on the effective date of the Joint Plan exceeds the entire amount of CBC's subordinating unsecured claim. According to CBC, the Joint Plan not only pays the subordinated class before paying CBC in full pursuant to its subordination rights, but circumstances of the Debtor and the Joint Plan are such that subsequent payment of CBC in full is speculative. Similar concerns are expressed on behalf of Class 7 as its treatment relates to Class 8.[5]

The Debtor argues that nonbankruptcy subordination rights need not be recognized in cramdown under 11 U.S.C. § 1129(b), home of the concepts of "unfair discrimination" and "fair and equitable". But even if they need be, the Debtor asserts, the Joint Plan does not violate the subordination rights of either Class 6 with regard to Classes 7 and 8, or Class 7 with regard to Class 8, since both classes are "paid in full" for purposes of cramdown on the effective date of the Joint Plan. The Debtor argues that neither subordination, nor absolute priority fair and equitable con-

---

**4.** Classes 11 and 12 would be issued contingent warrants whose value has been assessed by the Debtor at no value for distribution purposes.

**5.** Both CBC and the Senior Debentures argue that the payment to junior classes of stock and/or warrants violates the absolute priority rule if the senior classes have received less than

full payment. In order for receipt of shares by Class 7 Senior Debentures to constitute full payment when added to the cash and note the Class is to receive, the newly created equity under the Joint Plan must have value of at least $2.48 per share.

cepts, require that a senior class be paid in cash before payments are made to junior classes. All that is required under 11 U.S.C. § 1129(b), according to the Debtor, is that senior classes receive property of a present value equal to the allowed amount of their claims. The Debtor argues that the Joint Plan satisfies the requirement through distribution of property to these subordinating classes in combinations of cash, new equity and notes [6] equal to the allowed amounts of their claims.

The positions of the parties on these issues of application of nonbankruptcy subordination rights, unfair discrimination, and fair and equitable standards under 11 U.S.C. § 1129(b), as they relate to the payment and distribution scheme of the Joint Plan, are appropriately analyzed in light of feasibility of the Joint Plan and value of the Debtor as a going concern. Accordingly, it is necessary to digress from 11 U.S.C. § 1129(b) issues for the moment to consider these important related matters.

*Feasibility of The Joint Plan And Value of The Debtor as a Going Concern.*

Analysis of feasibility of the Plan and value of the Debtor as a going concern involve many of the same considerations. Feasibility, from an operational standpoint, is considered in light of future projected cash flow probability. Value of the Debtor is determined by using the same cash flow probability over the relevant future, and then reducing it to present value by a discount variable that represents a weighted average cost of capital. The discussion focuses first on feasibility, then on value.

■ *Feasibility.* Considerations of feasibility are viewed in the light of a preponderance standard. See: *In re Mcorp Financial*, 137 B.R. 219, 225 (Bankr.S.D.Tex. 1992); *Home Savings Ass'n. v. Woodstock Assoc. (In re Woodstock Assoc.)*, 120 B.R.

436, 453 (Bankr.N.D.Ill.1990); *In re Arnold*, 80 B.R. 806 (Bankr.M.D.La.1987). Accordingly, the Joint Plan would be considered feasible in satisfaction of 11 U.S.C. § 1129(a)(11), if it could be said that, more likely than not, confirmation will not be followed by liquidation, or the need for further financial reorganization. The Joint Plan proponents bear the burden of proof regarding feasibility. The burden has not been met.

■ Accurate prediction of any future course of events is an uncertain endeavor. Accurate prediction of future financial performance of a reorganized business operation often presents significant challenges, particularly where the structure and operations of the reorganized entity bear little relationship to the old one. Prudent prediction of the future financial performance of the Debtor under the proposed reorganization does not support the projected cash flows that drive the Joint Plan.[7]

Prudent prediction of future financial performance in this case is made somewhat easier because the Plan does not propose significant changes in either the structure or operation of the Debtor's core stores; nor does the Joint Plan call for the introduction of any new and untried business endeavor. The Joint Plan is not premised on the infusion of outside capital, but the proposed reorganization is based on a downsized operation in a more limited market with focus on selected profitable stores.

The projected cash flows in the Joint Plan are based on future performance of core stores that would survive the reorganization. The inquiry to determine validity of the projections begins by comparing them with the historical performance of the same stores. Same store projections reflect substantially higher predicted gross

---

6. The Joint Plan provides for the issuance to CBC of an accelerating unsecured note for any deficiency that might otherwise result in the payment of its unsecured claim from a finding that the value of the newly created equity under the Joint Plan is less than $2.16 per share. The Senior Debentures are to get a note in the amount of $997,000 in addition to the cash and shares provided it.

7. Prudence has been described as the art of accessing memory, analyzing it in light of present circumstances and environment, and applying the analysis to the future for purposes of selecting a course of action that best serves the legitimate interests of the inquirer. *See generally: The Art Of Memory*, Frances A. Yates, Univ. Ch. Press, 1966.

sales and significantly lower predicted key costs of sales than experienced in the past.

Gross sales of same stores project a growth of 2.8% for the 1993 fiscal year over 1992. Gross sales for fiscal year 1992 fell approximately 3.5% from 1991.[8] Gross sales during the summer months of this year failed significantly to meet the cash flow projections, causing the Debtor to postpone or reduce scheduled capital expenditures and reduce its media budget. Gross sales during the weeks immediately preceeding, and during the hearing were mixed, at best, in meeting the projections.

On the cost side, projections are significantly lower or are projected to remain flat during the period. Key costs include: food and beverage; labor; media; and other. The Debtor's general explanation for lower costs in its post-hearing Fact Memorandum is:

> Once the Company emerges from bankruptcy and is not distracted by that process and the other extraordinary matters which have occupied management, such as the divestiture of Canada, it is inevitable that management's renewed focus on the business will result in significantly better operations.

8. The Debtor prepared a store-by-store analysis (Joint Exhibit 36), comparing annual sales figures, citing what it refers to as unique factors that caused past poor performance, and offering reasons supporting expected improved future performance. However, the factors cited for the poor performance, such as road construction impeding access to a store and an outbreak of hepatitis at another, while not general common occurrences, are certainly within the scope of occurrences that one might expect to experience in the industry from time to time. Those factors cited in support of expected growth projections for the near term fiscal years, while positive in nature, are only some of myriad factors that can be expected to determine actual store performance.

9. For instance, the Debtor's cost of food and beverage for the 1992 fiscal year (26.5%) is already substantially below the industry average (32.3% for 1991). *See:* Exhs. 12 and 72. In part, this is due to the relatively less expensive ingredients that historically made up the Chi–Chi's cuisine. According to Chi–Chi's, menus will be changed in the near future to include more expensive ingredients as a strategy to maintain market share in an intensely competitive and shrinking market environment. In an

*Fact Mem. in Sup. Of Conf. Jt. Plan,* p. 11.

Whatever the intended meaning of "significantly better operations" is, it certainly is not inevitable that management could significantly reduce key costs as a percentage of sales. In light of present general economic conditions and intense competition within the industry, the more reasonable conclusion is that operating margins will likely shrink, reflecting greater absorption of costs, thereby increasing key costs as a percentage of sales rather than decreasing them.[9]

In short, explanations furnished to reconcile projected cash flows with substantially underperforming historical individual and collective same store cash flows, are insufficient to overcome the discrepancy. Furthermore, the projections, when viewed in light of present and near future likely economic and industry conditions, do not fare any better. Economic and competitive forces are more likely than not in the near term to keep prices down, shrink operating margins, and require significant capital expenditures, all of which will be necessary to maintain market share, and none of which will have a positive influence on cash flow.

intensely competitive market, more likely than not, these increased costs would tend to be absorbed (thereby increasing the cost closer to the industry average), rather than passed along to consumers through higher prices. The cost of liquor, all agree, will likely continue to rise. Again, in an environment of lingering recession (or post-recession no recovery, depending upon one's choice of economists) and intense competition in a shrinking market, it cannot simply be assumed that these increased costs can be passed along to consumers. Projected decreases in the cost of labor are based largely on general observations and intentions rather than specific substantial initiatives. If the cost does not decrease, or if labor costs increase, the extent to which the unanticipated expense can be passed on to consumers, is likewise uncertain. Historically, 4% of sales has been spent on media, apparently in recognition of the value, if not necessity, of this form of advertising to maintain market share and grow. The Debtor's projections reduce this cost to 3.5%, explaining that local advertising is becoming more and more important in the overall advertising scheme. The explanation is not persuasive.

The Debtor has already postponed capital expenditures due to recent shortfalls in actual sales from projected sales. Aside from that, the projections allow for minimal amounts available for store enhancements, with little or no margin for costs exceeding estimates.[10]

The projections assume builder financed construction of new stores under a "build to suit" concept, without initial capital outlay required of the Debtor. Chi–Chi's challenged the availability of the "build to suit" alternative in the current market, and offered testimony that Chi–Chi's itself, with access to more than $25,000,000 in equity, could not attract such an offer from a builder. The Debtor offered no evidence of the availability of "build to suit" construction for its new store construction. Similarly, Chi–Chi's challenged the Debtor's estimated costs of opening new stores, claiming that the actual cost would be substantially higher. Again, the Debtor's projections appear to be thin with no margin for error in cost estimates.[11]

The Joint Plan cash flow projections do not appear realistic under either historical comparison or present conditions analysis. Recent history of operations and present economic and industry conditions indicate a substantial risk of failure of the projections. Aggravating the risk is the weak liquidity position of the Debtor that would result from consummation of the Joint Plan. The Debtor intends to distribute approximately $3,000,000 in cash to various classes of creditors on the effective date of the Plan, which would leave, after payment of administrative expenses and other adjustments, less than $1,000,000 cash going forward.[12] Chi–Chi's offered testimony that, under more conservative but historically consistent cash flow projections, the Debtor would have only $660,000 available going forward, and that the Debtor would run out of cash by August 1993.[13]

In light of the foregoing, the Court finds that the Debtor has not proven by a preponderance that the Joint Plan is feasible.

■ *Value.* Six expert witnesses testified relating to the going concern value of Consul. One expert witness (Arthur Cobb), however, did not provide the Court with an independent valuation.[14] These valuations were received:

(1) Dain Bosworth Incorporated valued Consul at an aggregate value in excess of $29 million conservatively, as high as $34 million under most liberal assumptions. Larsen, Joint 67, Joint 53, Joint 54.

(2) R. Steven Tanner valued Consul at a "break-up value" in excess of $24 million. Tanner, Chi–Chi's EE.

(3) Ernst & Young found that the reorganization value of Consul exceeded

---

10. According to Chi–Chi's, the cost of store enhancements that the Debtor has provided for, and which are necessary to maintain market share, are substantially underestimated. The Debtor's projections call for expenditures of $40,000 to $50,000 per store. According to Chi–Chi's, an average of $150,000 is needed for enhancements.

11. The Debtor claims that its cash flow projections have margin for error regarding these matters because they do not fully value a note receivable in the face amount of $1,200,000 resulting from the Canadian sale, and anticipated revenues from the sale of two Louisiana stores. However, valuation of the note discounted reflects the uncertainty of payment, and the full face value provides little margin unless and until it is collected. No evidence was offered regarding collectibility of the note. No purchase agreement exists for either of the stores, and no buyer has been identified.

12. The Debtor boosted its cash position as of the effective date of the Joint Plan by providing for

realization of income through wire transfers scheduled earlier than in the ordinary course during the case and by reduction of scheduled capital expenditures during the period.

13. In an appraisal of the Debtor made for the Unsecured Creditor's Committee, Ernst & Young concluded that prudent management of the Debtor would require maintenance of a cash position going forward of approximately $2,000,000. Mr. Tamosuinas, author of the report, hedged somewhat from that conclusion in his testimony at trial, but unpersuasively. At the time the appraisal was made, relationship of the Committee and the Debtor was adversarial. Of course, the Committee is a proponent of the Joint Plan, and at trial pursued identical interests.

14. Mr. Cobb's analysis examined and critiqued the valuation report prepared by Dain Bosworth.

$19 million. Tamosuinas, Chi–Chi's BB.

(4) Don Nicholson adjusted and reduced the Ernst & Young valuation to approximately $10 million. Nicholson, Chi–Chi's KK, Chi–Chi's LL.

(5) Based on Nicholson's projections, Houlihan, Lokey, Howard & Zukin valued Consul at approximately $12 million. Daniels, Chi–Chi's OO.

Interestingly, the experts agreed on the better methodology that should be used in valuing the Debtor, the discounted cash flow method. Similarly, each used essentially the same formula in the analysis. Yet, a $20,000,000 spread exists in opinions on the value of the Debtor's business, between $10,000,000 and $30,000,000. Each expert's opinion is purportedly based on a conservative estimate. The differences are largely accounted for by the use of different assumptions in determining the variables upon which the formula operates.[15]

At the outset, Mr. Larsen's valuation is rejected for several reasons. Most important is that the Joint Plan is not based on his valuation. Mr. Larsen performed the valuation for the Debtor at a time when the Debtor and the Unsecured Creditor's Committee were not getting along. The Joint Plan is more the Committee's influence than the Debtor's and is based on the Ernst & Young valuation.[16] Seemingly, the Larsen valuation is offered by the Joint Plan proponents as a frontier position to make the Ernst & Young valuation appear more conservative and reasonable.

Mr. Larsen's valuation apparently assumes a turned around, financially healthy Debtor in a robust economy like the late 1980's. The Debtor is struggling in an intensely competitive and hostile financial and economic environment that is nothing like the late 1980's. Furthermore, the Debtor does not struggle from a position of strength, and would emerge from the protection of the Bankruptcy Court as a relatively weak player in its market. The valuation is simply not credible.

The Ernst & Young valuation presents a more accurate frontier position of the going concern value of the Debtor. That valuation, $19,000,000, assumes the cash flow projections of the Debtor's management. It also draws key cost of capital information from 1980's industry comparables. Despite assertions to the contrary, the valuation is, as a result, a very liberal assessment. A conservative Ernst & Young valuation results from the adjustments made to its assumptions by Mr. Nicholsen in his rework of it with cash flow projections more historically consistent with the same store operations of the Debtor, and with cost of capital assumptions (particularly cost of equity), that are more realistic in the current economic environment.

Having carefully considered all of the substantial, relevant testimony and documentary evidence regarding the issue, the Court finds that the most that can be said with any integral degree of certainty about the going concern value of the Debtor is that the value lies somewhere between $10,000,000 and $19,000,000, probably toward the lower end of the range.

*Treatment of CBC And Senior Subordinated Debentures Under 11 U.S.C. § 1129(b).* Class 6, CBC, objects to confirmation, and the Senior Subordinated Debentures express concern on grounds that their subordination rights are being improperly ignored under the Joint Plan. The Joint Plan proponents disagree.

11 U.S.C. § 1129(b)(1) provides:

(b)(1) *Notwithstanding section 510(a) of this title,* if all of the applicable requirements of subsection (a) of this section

---

**15.** The record on this issue verifies that formulas, like trained animals, perform according to what they are fed.

**16.** If Mr. Larsen's valuation is correct, it would appear that at least $7,000,000 in value of the Debtor rightfully belongs to prepetition equity security holders, including common holders. This Plan is not funded by any postpetition capital infusion. Total debts are approximately $21,000,000 with administrative expenses at approximately $1,000,000. Yet, the Debtor explained that the common holders were not solicited regarding the Joint Plan because they were to receive nothing of value and it would be too costly.

other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. (emphasis added).

The Joint Plan proponents first argue that subordination rights of classes are not enforceable in cramdown by the plain language of 11 U.S.C. § 1129(b)(1). However, it is generally understood that such rights are enforceable under the discrimination and fair and equitable concepts of the statute. *See:* 5 Collier on Bankruptcy ¶ 1129.-03[3][b], 1129–67 (15th ed. 1992); K. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 133, 142 n. 70 (1979).

■ Next, the Joint Plan proponents argue that the subordination rights of these dissenting classes are satisfied because Classes 6 and 7 will receive payment in full on the effective date of the Joint Plan. For Class 7, the Senior Debentures, the question is whether the value of the proposed new shares to be issued the class will have a present value of at least $2.48 per share. For CBC, the question is whether a combination of cash, shares and an accelerating unsecured note with an appropriate interest rate, is fair and equitable when substantial cash payments are proposed for distribution to a subordinated class on the effective date of confirmation.

The burden of proof is with the Joint Plan proponents on these issues. The standard of measure is not clear. A number of courts have held that confirmation of a plan pursuant to section 1129(b) requires proof by clear and convincing evidence.[17] *In re Mcorp Financial*, 137 B.R. at 225; *B.W. Alpha v. First City Nat'l Bank of San Angelo (In re B.W. Alpha)*, 100 B.R. 831 (Bankr.N.D.Tex.1988); *In re Rusty*

*Jones*, 110 B.R. 362, 373 (Bankr.N.D.Ill. 1990); *In re Future Energy Corp.*, 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988); *In re Agawam Creative Mktg. Assoc.*, 63 B.R. 612, 618–19 (Bankr.D.Mass.1986); *In re Stoffel*, 41 B.R. 390, 392 (Bankr.D.Minn.1984). If so, *conclusive* proof is not required. *American Cyanamid Co. v. Electrical Indus.*, 630 F.2d 1123, 1127 (5th Cir.1980). *But see: Grogan v. Garner*, 498 U.S. 279, ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); and, *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). These Supreme Court cases indicate that a preponderance standard might apply. Here, the burden has not been met under either standard.

For the present value of the new proposed shares to equal at least $2.48 per share, the present value of the Debtor as a going concern must be at least $19,000,000. For reasons already discussed, that is unlikely. Accordingly, the Joint Plan proponents have not shown that Class 7 would be paid in full on the effective date of the Joint Plan so as to comply with the fair and equitable standards of 11 U.S.C. § 1129(b). The scheme appears to violate the absolute priority rule in that a subordinated class would receive property while the subordinating class would be left without full payment.

The Joint Plan would pay CBC's subordinating claim of $1,094,000 by $400,000 in cash on the effective date, 321,000 newly issued shares of equity of the Debtor ($694,000 at $2.16 per share), and an accelerating unsecured note for any deficiency resulting from a finding that the new equity has a present value of less than $2.16 per share. For the proposed new shares to have a present value of $2.16 per share, the going concern value of the Debtor must be approximately $17,700,000. For the reasons already discussed, that is not likely.

The proposed distribution scheme is not fair and equitable to CBC because it would pay out on the effective date of the Joint Plan to CBC's subordinated creditor, Class 7 Senior Debentures, cash exceeding the

---

17. "The standard requires a higher degree of proof than a preponderance of the evidence.... The standard requires that the existence of disputed facts be highly probable, that is, much

more probable than its nonexistence." *American Cyanamid Co. v. Electrical Indus.*, 630 F.2d 1123, 1127 (5th Cir.1980). *Id.* (citation omitted).

entire subordinating unsecured debt. CBC would receive 63% of its "payment in full" on the same date in new stock and an unsecured accelerating note.

■ Under the Bankruptcy Act, such a scheme was not permissible. See: *In re Central R.R. Co. of New Jersey*, 579 F.2d 804 (3d Cir.1978); and *United States v. Key*, 397 U.S. 322, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1970), concurring opinion of Justice Douglas. Under the Bankruptcy Code, the statute specifically allows for the concept of fair and equitable to accommodate payment of senior secured debt through retention of liens and deferred present value payments, with interim distributions of cash to junior classes, secured and unsecured. *See:* 11 U.S.C. § 1129(b)(2). Recognition of such a distribution scheme under the Code is essential to the entire concept of reorganization. The senior secured class is protected by retention of the collateral interest and is compensated for the risk, presumably slight, in going forward by the terms of the note.

The same cannot be said with respect to the distribution scheme here. First, no apparent legitimate purpose is served the reorganization of the Debtor by distributing to the subordinated class available cash that, if distributed to the senior subordinating class, would pay the senior class in full. Such a scheme would materially shift the risk of failure of the Plan from the subordinated to the subordinating class for no apparent reason other than to secure acceptance of the junior class by allowing it to overreach the senior class. Even absent the finding on feasibility, it can hardly be questioned that, should the Joint Plan be confirmed, the Debtor would have significant risk of failure going forward. A class "paid in full" with new equity and unsecured notes has payment without currency when the debtor fails before the note is paid or before the shares can be sold.[18] In the meantime, the junior class would have received irretrievable currency payment at the real cost to the senior class.

■ The concept of fair and equitable involves more than the application of a mechanical calculation of absolute priority based on distribution of property valued abstractly. When the proposed distribution would substantially shift the risk of failure of the plan from a junior class to a senior dissenting class for no legitimate purpose, the plan is not fair and equitable to the dissenting class.[19] Such is the case here.

*Summation on Confirmability of The Joint Plan.*

The Joint Plan is not confirmable because the Plan has not been shown to be feasible under 11 U.S.C. § 1129(a)(11), and because it has not been shown to be fair and equitable to the dissenting Classes 6 and 7.[20]

## II.

## CHI–CHI'S PLAN

*The Plan.*

The Chi–Chi's Plan is essentially a takeover plan. It is one by which the wholly-

---

**18.** Interestingly, none of the experts would record an opinion of what the new shares would be worth in spendable value, that is, at what price they would trade in the marketplace. The Joint Plan provides for the new shares to be publicly traded like the prepetition equity shares. Those shares traded for 31 cents per share on the last day they were traded.

**19.** Why the Joint Plan proponents chose to distribute cash to Class 7 Senior Debentures and shares and notes to CBC is a mystery. Ultimately, Class 7 rejected the Plan anyway and the proponents are unsuccessful in cramming down the Class. Nevertheless, it seems that there existed from the beginning a better chance to cramdown the subordinated class holding shares where no cash is available for distribution to it because of payment to a senior class, than to cramdown the subordinating class holding the same shares where the cash is not available for distribution to it because of payment to a junior class.

**20.** Chi–Chi's objected to confirmation on the additional grounds that the Debtor could not properly assume the Chi–Chi's franchise under the Joint Plan because of its present net worth deficiency from that required by the agreement, and because of what Chi–Chi's claims is a more rigorous and expanded construction requirement in the agreement for new stores than is provided for under the Joint Plan. These objections are specious and do not merit extended discussion. They are simply overruled, the one in light of 11 U.S.C. § 365(b)(2)(A), and the other in light of the good faith prior conduct and dealings of the parties.

owned subsidiary of Chi–Chi's, Inc., CCMR, Inc., would purchase the newly issued shares of the reorganized Debtor for $8,700,000 and assume approximately $4,000,000 of the Debtor's secured debt, payment of which is guaranteed by Chi–Chi's. The present common and preferred stock of the Debtor would be cancelled. The $8,700,000 together with certain other assets of the Debtor, including approximately $5,000,000 of cash on hand and the Canadian Notes with a face value of $1,200,000, would be deposited with a Creditors Fund to be distributed in accordance with the priorities of the Bankruptcy Code. In addition, Chi–Chi's filed a motion to assume certain of the Debtor's leases, which payments would also be guaranteed by Chi–Chi's. No objections were filed by any landlord to this motion.

In response to certain objections received to the Plan, Chi–Chi's moved to modify its Plan to provide for the settlement of a certain adversary proceeding pending between Chi–Chi's and the Debtor, to withdraw Chi–Chi's pre-petition claim against the Debtor, and to increase the Creditors' Fund by any proceeds received from the sale of the Louisiana assets.[21] As a result of those changes and other assumptions as set forth in Chi–Chi's Plan and Disclosure Statement, Chi–Chi's anticipated that the claims of Class 6 Circle Business Credit, and the claims of Class 7 Senior Debentures would be paid in full. The claims of the other unsecured creditors, Class 9 would receive approximately 73.7% of their claim, and the claims of Class 8 Subordinated Debentures would receive approximately 9.1% of the estimated amount of their claims. All subordination rights of the classes are recognized and the proposed distribution would be the result of application of the relative priority rights among the subordinating and subordinated classes. One impaired creditor, the Class 6 claim of CBC, voted to accept Chi–Chi's Plan.[22]

The Debtor stipulated at the hearing that the creditors would receive or retain under Chi–Chi's Plan more than they would receive if the Debtor were liquidated under Chapter 7. Also, the Debtor stipulated that Chi–Chi's Plan, which proposes to pay creditors in accordance with the priorities of the Bankruptcy Code, met the absolute priority portion of the fair and equitable cramdown standards of Section 1129(b)(2)(B). Finally, Chi–Chi's Plan was not challenged on any feasibility issue by the Joint Plan proponents.

*Objections to the Chi–Chi's Plan.*

The Joint Plan proponents object to confirmation of the Chi–Chi's Plan on several grounds.[23] One is that, according to them, the CBC vote was "bought" by more favorable interest rate treatment to CBC than to similarly situated secured creditors. The assertion, however, is not supported by the record in the case.

There is no other similarly situated secured creditor in the case. The creditor coming closest to CBC in size of secured claim is Chrysler Capital and it holds a mortgage on real estate for the full amount. The other secured claims are relatively small and are collateralized with reliable security. The obligation to CBC is collateralized by highly depreciable equipment, whose value in liquidation is speculative. The existing loans were intended to be short term, according to CBC, and the proposed treatment is appropriate and necessary simply to preserve its present position. While the interest on the debt is generous at 500 basis points over the rate provided other secured creditors, that, un-

---

**21.** The Joint Plan provides for the sale of two stores in Louisiana as the final phase of its downsizing and restructuring efforts.

**22.** The Creditor's Committee has filed a motion to disqualify the CBC vote on the grounds that the vote was "bought." Chi–Chi's has responded to that motion in a separate pleading. The issue will be addressed in this part of the opinion.

**23.** The American Bank Mankato also objected to confirmation of Chi–Chi's Plan. The Bank's objections are specifically related to treatment of its secured claim and are couched in terms of feasibility and fair and equitable considerations. The Bank did not participate in the hearing and, accordingly, offered no testimony or other competent evidence to support its allegations. The objections are specious and are simply overruled without further comment.

der circumstances of its six-year term and declining collateral value, is not sufficient evidence that the vote was bought.

■ Another objection concerns the Chi–Chi's franchise agreement. The Chi–Chi's Plan would ignore or reject the agreement. The Joint Plan proponents argue strenuously that only the Debtor can assume or reject the franchise agreement and, in any event, the purported rejection of it by the Chi–Chi's Plan fails to meet the best business judgment test. The objection is specious. At one point late in the discussion, the Unsecured Creditor's Committee observes that:

> By proposing to reject the Franchise Agreements in the Chi–Chi's Plan, Chi–Chi's is effectively dealing with itself.

*Supplemental Motion For Order Denying Confirmation,* p. 14. That is precisely what makes the entire argument specious. Chi–Chi's Plan is a buy out plan that includes the franchise agreement. The Debtor's creditors will be paid out of proceeds from the buy out. Since Chi–Chi's is also the franchisor under the agreement, the agreement becomes moot, and, in any event irrelevant to the Debtor's creditors.

■ The remaining significant objections by the Joint proponents are that the Chi–Chi's Plan is proposed in bad faith and is not fair and equitable to general unsecured and subordinated creditors.[24] These objections are driven by the premise that the Plan basically is an improperly leveraged hostile takeover attempt that would steal much of the Debtor's value from its junior creditors. The record does not support that assertion.

The Debtor certainly has value. Value in the range assumed by the Joint Plan proponents, however, is more potential future value than real present value. It is apparent that the Chi–Chi's concept and the Debtor's existing stores, are potentially very viable and can be highly competitive in the Debtor's market area. But it is equally apparent that the Debtor's present position is a weak one in a hostile economic and intensely competitive environment.

Former management policies allowed the Debtor to become seriously undercapitalized over a several-year period to the verge of ruin. Apparently, the severe downturn in the economy in 1990 precipitated a crisis for the Debtor. Since then, the new management admirably accomplished the restructuring and downsizing necessary to make a recovery possible. But more than restructuring and downsizing is necessary, especially in the present environment, to make recovery probable. What is needed is a substantial retention or infusion of capital to both provide for necessary capital expenditures, and for maintenance of a healthy liquidity position in anticipation of reasonably expected shortfalls in cash flow over the near term.

The provision for stripping $3,000,000 in cash from the Debtor to pay creditors on the effective date of confirmation, stripped the Joint Plan of feasibility. The provision also betrays the understanding and appreciation by the Joint Plan proponents of the inherent risk of failure of the Plan, and of their unwillingness to accept their own position regarding present value of the reorganized Debtor. Otherwise, presumably, they would have proposed to leave the cash in and convert more debt to new equity, thereby increasing the strength of the Debtor rather than sapping it further.

In order for the Debtor to achieve value in the range that the Joint Plan proponents perceive as present value, substantial risk capital must be committed over the near term that will not positively translate to the near term bottom line net cash flow. The Joint Plan proponents are unwilling to make that commitment. Yet, they value the Debtor as if the commitment has been made, the risk overcome, and the worth realized.

Chi–Chi's is willing to invest the capital and to assume the risk. Because of who Chi–Chi's is, it might have a unique interest in making the investment and, perhaps,

---

**24.** Other objections are that the Plan cannot be confirmed because of its Plan Administrator and related provisions, and because the Plan settles a lawsuit with itself. These objections are without merit and are not otherwise commented on here except to overrule them.

Chi–Chi's might stand to benefit more than an ordinary passive investor. But that does not turn the proposal to acquire the Debtor into a bad faith plan; nor is the proposal unfair and inequitable under 11 U.S.C. § 1129(b) to creditors who will not receive payment. The proposed price is well within the range of probable present value of the Debtor, and there exists no better offer.

The various objections to confirmation of the Chi–Chi's Plan are insufficient to prevent confirmation.

## III.

### DISPOSITION

Based on the foregoing, IT IS HEREBY ORDERED: confirmation of the Joint Plan is denied, and the Chi–Chi's Plan is confirmed. All pending motions are granted or denied, consistent with this ORDER.